IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HOLLY MAGALENGO, on behalf of her daughter, A.M., a minor, <br>                           Plaintiff <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, PENNSYLVANIA INTERSCHOLASTIC ATHLETIC ASSOCIATION, INC., QUAKERTOWN COMMUNITY SCHOOL DISTRICT, and COLONIAL SCHOOL DISTRICT, <br><br>                    Defendants | Civil Action No.  2:25-cv-00325 |

**BRIEF IN SUPPORT OF DEFENDANT COLONIAL SCHOOL DISTRICT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

## I.  FACTUAL BACKGROUND

On January 27, 2019, the Colonial School District's ("CSD") Board of School Directors ("Board") adopted Policy 256 titled Gender Expansive and Transgender Students. (Policy 256, attached as Exhibit 1). Policy 256 provides, in pertinent part, "It is the policy of [CSD] to provide an equal opportunity for all students to achieve their maximum potential through the programs offered in the schools regardless of, among other facts, gender, gender identity and gender expression." *Id.* Policy 256 was adopted "to ensure compliance with other [CSD] policies, applicable state and federal law, and to foster an educational environment that is safe and free from discrimination based on gender identity and gender expression." *Id.*  Regarding sports and physical education classes, Policy 256 provides "Gender expansive or transgender students shall be

1

permitted to participate in athletic programs/opportunities and physical education classes in a manner that is consistent with their authentic gender identity." *Id.* at pgs. 4-5.

On January 20, 2025, Plaintiff filed the Complaint, on behalf of her daughter, A.M., against CSD, alleging CSD[1] violated the Equal Protection Clause of the Fourteenth Amendment by allowing one of its students, L.A., a transgender girl, to compete on the girls' cross country team. (ECF No. 1). A.M. is a student attending school in the Quakertown Community School District and is a member of the cross country team. (ECF No. 1 at ¶¶ 1, 13). Subsequently, on February 25, 2025, Plaintiff filed a Motion for Temporary Restraining Order, requesting the Court enter an order prohibiting all biological males from participation in and competition in female sports. (ECF No. 15).

L.A., a transgender girl, is a senior at Plymouth Whitemarsh High School ("PWHS"), a school in the CSD. L.A. is the only transgender student competing in PWHS athletics. (<u>Declaration of Ralph C. Bretz, Jr.,</u> attached as Exhibit 2, ¶ 12). In accordance with CSD Policy 256, L.A. began competing in athletics on the girls' track and field team during the Spring of 2023. *Id.* L.A. competed on the girls' cross country and track and field teams during the 2023-2024 and 2024-2025 school years. *Id.* at ¶ 5.

PWHS has a girls' outdoor track and field team that competes in the Spring. *Id.* at ¶ 4. In the Spring of 2024, there were 39 students on the team. *Id.* The Spring 2025 team is not set until March 2025. *Id.* PWHS also has a girls' cross country team that competes in the Fall. *Id.* In the Fall of 2024, the team had 29 students between the varsity and junior varsity rosters. *Id.* at ¶ 5.

---

[1] Plaintiff's Complaint also alleges that the United States Department of Education, the Pennsylvania Interscholastic Athletic Association, Inc, and Quakertown Community School District violated the Equal Protection Clause of the Fourteenth Amendment. (ECF No. 1).

Under the Pennsylvania Interscholastic Association, Inc., ("PIAA") rules, athletes in outdoor track and field compete during the regular season in dual meets, double dual meets, and invitational meets. *Id.* at ¶ 7. Athletes who reach set qualifying times for specific events at one of these sanctioned events are submitted into the League Championships. *Id.* at ¶ 7. Individual advancement in that scenario is based on the runner's times in their events. *Id.* at ¶ 8.

An athlete's times in sanctioned events who reach set qualifying times are also entered into the District championships. *Id.* at ¶ 8. Pennsylvania has 12 districts across the state. *Id.* PWHS is in District 1. *Id.* At District tournaments, the top three to four athletes, depending on the event, advance to the State Championships, where all 12 Districts are represented and send their athletes with the best times to compete at the end of the season. *Id.* There, again, the athletes are ranked by time. *Id.*

In the league in which PWHS participates, the Suburban One League, there are four divisions (National, Continental, Liberty, and American), each consisting of eight teams. *Id.* at ¶ 9. Teams (not just individuals) can compete for their division titles and league championship by scoring points for each event in which its team members place first through fifth place. *Id.* PWHS and Quakertown Community High School ("QCHS") are in the Liberty Division within the Suburban One League, which also includes four other school districts in the area. *Id.* at ¶ 9.

For the PIAA cross country advancement process, varsity coaches select their top seven runners from each school to participate in the Suburban One League open race. *Id.* at ¶ 10. For the District One open race, varsity coaches select seven runners to represent their school in the District One race. *Id.* at ¶ 11. The top five teams from each District (35 runners) advance onto state qualifications. *Id.* In addition to the team runners, the next 25 fastest individual times also advance

to the state race. *Id.* A total of 60 runners from District One can qualify for the state race – a combination of the top five teams and then the next 25 individual runners. *Id.*

Most track and field and cross country race results are maintained on a website called "MileSplit," which is the system PIAA uses to prove qualifying times in cross country and track and field events. *Id.* at ¶ 13. Students L.A. and A.M. both run cross country. *Id. at* ¶ 19. During the PWHS meet against QCHS on September 11, 2024, MileSplit shows L.A. ran 21:54. *Id.* In that race, A.M. ran 22:15. *Id.* While L.A.'s time was faster than A.M.'s time in that race, neither of their times from that race qualified them for any further competition—in order to qualify to advance in cross country, athletes have to place in the open races discussed above. *Id.* at ¶ 10-11.

Students L.A. and A.M. both participate in track and field. *Id.* at ¶ 14. Following a review of MileSplit data for track and field, Students L.A. and A.M. run just two of the same events - the 400m and the 4x400m relay. *Id.*

PWHS does not organize or supervise events held by the Delaware Valley Girls' Track Coaches' Association ("DVGTCA"). *Id.* at ¶ 6. Plaintiff's Complaint alleges that students L.A. and A.M. competed in a DVGTCA meet on December 13, 2024, in the 4x400m relay race. *Id* at ¶ 25. L.A. and A.M. ran in the same relay event, but not in the same heat. *Id.* at ¶ 26. There were four members in each relay. *Id.* PWHS was in heat 7, QCHS was in heat 2. *Id.* MileSplit shows that the PWHS team finished in 1st place and QCHS finished in 25th place. *Id.* at 27. The time difference between 1st and 25th place was 31 seconds. *Id.* PWHS completed the meet in 4:10 and QCHS completed the meet in 4:41. *Id.*

To the best of the knowledge of Ralph C. Bretz, Jr., Assistant Principal and Athletic Director at PWHS, college recruiters for running teams (both track and cross country), review and consider an athlete's race times throughout their season, watching for consistency of times across

the duration of the season to account for outlier conditions or performances. *Id.* at ¶¶ 1, 27. College recruiters do not attribute as much, if any, weight to how many times an athlete is on a podium, or whether the athlete's teammates are of the same caliber so that they are winning team matches consistently. *Id.* at ¶ 27. L.A. is not being recruited by college running coaches for participation in either track and field or cross country teams at any NCAA division level – 1, 2, or 3. *Id.* L.A.'s performance times do not meet typical recruitment criteria. *Id.* at ¶ 28.

## II.    **ARGUMENT**

A preliminary injunction or a temporary restraining order ("TRO") is an extraordinary remedy granted only in limited circumstances. *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). Courts apply one standard when considering whether to issue interim injunctive relief, regardless of whether a petitioner requests a TRO or preliminary injunction. *Thakker v. Doll*, 451 F. Supp. 3d 358, 364 (M.D. Pa. 2020) (*citing Ellakkany v. Common Pleas Court of Montgomery Cnty.*, 658 Fed.Appx. 25, 27 (3d Cir. 2016)). The main purpose of either form of this preliminary injunctive relief "is *maintenance of the status quo* until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994) (emphasis added). "Status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal citation and quotation marks omitted). Here, the status quo is allowing students to compete in athletics in a manner consistent with their gender identity.

Indeed, due to the extraordinary nature of preliminary injunctive relief, a motion for a TRO places high, precise burdens on the moving party. In deciding to issue TRO, "a district court must carefully weigh four factors: (1) whether the movant has shown a reasonable probability of success of the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether

granting the preliminary relief will be in the public interest." *Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994). The movant bears the burden of showing that the factors weigh in favor of granting the injunction. *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). In addition, a party's failure to demonstrate a likelihood of success in the litigation *or* an irreparable harm "must necessarily result in the denial of a preliminary injunction." *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982). Further, the movant must demonstrate that the "preliminary injunction must be the only way of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992). A TRO "should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). For that reason, "upon an application for a preliminary injunction [or TRO] to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937). As detailed below, there is much to doubt about Plaintiff's claims. Accordingly, the Court should deny Plaintiff's Motion for a TRO to ban biological males from participation and competition in female sports.

        A.      **Plaintiff is Unlikely to Demonstrate a Reasonable Probability of Success On the Merits of Her Underlying Action.**

            1.      Plaintiff Cannot Establish a Prima Facie Case of Violations of the Equal Protection Clause of the Fourteenth Amendment.

Demonstrating a likelihood of success on the merits requires that the party prove a prima face case. *See Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160, 173 (3d Cir. 2001). This "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (citations omitted).

In her Complaint, Plaintiff alleges that the CSD violated the Fourteenth Amendment Equal Protection Clause by permitting L.A., a transgender female attending PWHS, to compete against her daughter, A.M., a biological female, in a girls' cross country meet. (ECF No. 1 at pgs. 3-6).

In support of her claim that she can establish likelihood of success on the merits of her underlying action, Plaintiff avers that "Allowing transgender individuals to participate in women's sports violates the rights of female athletes under Title IX, which aims to prevent sex-based discrimination in educational programs and activities." (ECF No. 15-1, p. 3). In support of this averment, Plaintiff refers to *Johnson v. National Collegiate Athletic Ass'n*, 108 F.4th 163 (3d Cir. 2024). However, *Johnson* does not stand for the proposition asserted by Plaintiff. Rather, the gist of *Johnson* is whether college students are entitled to minimum wage under the Fair Labor Standards Act for time spent on sports-related activities. *Id.*

Next, in support of her contention that she can demonstrate a likelihood of success on the merits, Plaintiff states: "The Third Circuit has recognized that policies protecting transgender individuals from discrimination serve a compelling state interest and are narrowly tailored to achieve that purpose." (ECF. No. 15-1, p. 3). Yet, Plaintiff fails to cite to <u>any</u> decisions by the Third Circuit (or any other circuit) to support this statement.

Plaintiff's last argument in support of her claim that she can demonstrate a likelihood of success on the merits is a citation to Executive Order 14168, dated January 20, 2025, titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government ("Executive Order").[2]  (Executive Order 14168, titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, attached as Exhibit 3). Plaintiff cannot establish a likelihood of success of the merits of her claim based on this Executive Order. The Executive Order does not confer any rights, *per the Executive Order*. Section 8 of the Executive Order states "This order is not intended to, and does not, create

---

[2] Plaintiff states that the executive order is attached as "Exhibit A," however, Plaintiff did not file any exhibits with her motion and brief.  (ECF No. 15-1, p. 3).

any right or benefit, substantive or procedural…" (Exhibit 3, Section 8(c)). In addition, executive orders do not create new laws, amend existing laws, or offer binding legal interpretations to be followed. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

 2. CSD is in Compliance with Federal and State Law Prohibiting Sex
   Discrimination.

CSD is in compliance with federal and state law prohibiting sex discrimination. The Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIfV, § 1.  In other words, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Accordingly, discrimination is prohibited against classes of people in an "arbitrary or irrational" way or with the "bare…desire to harm a politically unpopular group." *Id.* at 446-47.

It is well established that transgender people constitute a protected, quasi-suspect class under the equal protection clause, subject to heightened intermediate scrutiny. *See Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267 (W.D. Pa. 2017); *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020); *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704 (D. Md. 2018). "[A]ll gender-based classifications today" warrant "heightened scrutiny." *U.S. v. Virginia*, 518 U.S. 515, 555 (1996) (internal citations omitted). "[A] party seeking to uphold government action based on sex must establish an 'exceedingly persuasive justification' for the classification."  *Id.* at 524. (internal citations omitted).

On January 27, 2019, the Board of the CSD adopted Policy 256, titled Gender Expansive and Transgender Students, "to provide an equal opportunity for all students to achieve their maximum potential through the programs offered in the schools regardless of, among other facts, gender, gender identity and gender expression."  (Exhibit 1, p. 1.)  In addition, Policy 256 was

adopted to ensure CSD was in compliance with other CSD policies, as well as applicable state and federal law. *Id.* Furthermore, the policy was adopted "to foster an educational environment that is safe and free from discrimination based on gender identity and gender expression." *Id.*

Under Policy 256, gender expansive or transgender students are permitted to participate in athletic programs/opportunities and physical education classes "in a manner that is consistent with their authentic gender identity." *Id.* at pgs. 4-5.[3] In accordance with Policy 256, L.A. began competing on girls' athletic teams in Spring 2023. (Exhibit 2, ¶ 12).

CSD Policy 256 comports with the law in the Third Circuit. In *Doe v. Boyertown Area School District*, the Court denied a preliminary injunction requested by cisgender students on the grounds that the district's policy of allowing transgender students to access bathrooms and lockers consistent with their gender identity violated the cisgender students' privacy rights and Title IX. 897 F.3d 518 (3d Cir. 2018). In 2016, Boyertown changed its policy and permitted transgender students "to use restrooms and locker rooms consistent with their gender identity." *Id.* at 524. The Court noted that "[t]here can be 'no denying that transgender individuals face discrimination, harassment and violence because of their identity." *Id.* at 528. Further, the Court determined that "barring transgender students from restrooms that align with their gender identity *would itself pose a potential Title IX violation." Id.* at 533. (emphasis added). Further, even if the policy had "implicated the plaintiffs' constitutional right to privacy, the state had a compelling interest *in not discriminating against transgender students.*" *Id.* at 525. (emphasis added).

Based on the Court's ruling in *Doe,* barring a transgender student from participating on the athletic team that aligns with their gender identity would itself pose a potential Title IX violation.

---

[3] Policy 256 defines Authentic Gender Identity as "an exclusive commitment to either a male or female gender identity asserted across multiple settings from the time when a person begins to live as the gender with which they identify rather than the gender they were assigned at birth." *Id.* at p. 1.

CSD must also comply with state law regarding discrimination.  The Pennsylvania Human Relations Act ("PHRA") prohibits discrimination, in among other places, educational institutions. 43 P.S. § 951. This prohibition includes discrimination against individuals on the basis of sex. 43 P.S. § 955. In 2023, the Pennsylvania Human Relations Commission promulgated new regulations more clearly explaining the definition of sex. Sex discrimination is defined under the PHRA as:

> [h]aving or being perceived as having a gender-related identity, appearance, expression, or behavior, which may or may not be stereotypically associated with the person's sex assigned at birth.  Gender identity or expression may be demonstrated by consistent and uniform assertion of the gender identity or any other evidence that the gender identity is part of a person's core identity. 16 Pa.Code § 41.204.

### B.    Plaintiff Cannot Demonstrate Irreparable Harm.

Plaintiff has failed to coherently identify any irreparable harm, which is fatal to her motion. The Third Circuit is clear that a plaintiff must demonstrate "a clear showing of immediate irreparable injury . . . or presently existing actual threat." *Continental Grp., Inc. v. Amoco Chems. Corp.,* 614 F.2d 351, 359 (3d Cir. 1980).  A preliminary injunction may not be used to eliminate a possibility of remote future injury, or a future invasion of rights, whether those rights are protected by a statute or common law. *Id.* The risk of irreparable harm must not be speculative. *Adams v. Freedom Forge Corp.,* 204 F.3d 475, 488 (3d Cir. 2000). Further, if the threatened harm may be compensable with money damages, a preliminary injunction is not the proper relief. *See Frank's GMC Truck Ctr., Inc. v. G.M.C.,* 847 F.2d 100, 102–03 (3d Cir. 1988) ("The availability of adequate monetary damages belies a claim of irreparable injury.").

An assertion of irreparable harm must be based on concrete evidence. *See Adams v. Freedom Forge Corp.,* 204 F.3d 475, 488 (3d Cir. 2000). Bald and conclusory statements are not sufficient. *Brown v. Beard*, No. 8-cv-26, 2008 WL 11344639, at *2 (W.D. Pa. Mar. 5, 2008). Issuing a preliminary injunction "based only on a possibility of irreparable harm is inconsistent

with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that a plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008).

Numerous courts in this Commonwealth, both federal and state, have concluded that a student is not "irreparably harmed" for purposes of injunctive relief based upon any potential loss of scholarship or professional opportunities due to their ineligibility for athletic competition, which is far greater than the unsubstantiated speculative harm alleged by the Plaintiff. *See, e.g., Dziewa v. Pennsylvania Interscholastic Athletic Ass'n, Inc*., No. CIV.A. 08-5792, 2009 WL 113419, at *7 (E.D. Pa. Jan. 16, 2009) ("This Court, as well as all other federal courts, have previously and consistently held that ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm."); *Cruz v. Pennsylvania Interscholastic Athletic Ass'n, Inc.,* Civ. A. 00-5594, 2000 WL 1781933, *1 (E.D. Pa. Nov. 20, 2000) (no irreparable harm where student was "limited in his participation in high school athletics rather than barred from it entirely" and could still practice with his team, dress in uniform and attend competitions); *Mattison v. E. Stroudsburg Univ.*, No. 3:12-cv-2557, 2013 WL 1563656 at *4–5, 2013 U.S. Dist. LEXIS 52579 at *16-17 (M.D. Pa. Apr. 10, 2013) (one year ban from college baseball team and possible consequences to career as professional baseball player was not immediate, irreparable harm); *Sahene v. Pennsylvania Interscholastic Athletic Ass'n*, No. 99-902, at 5-6 (W.D. Pa. July 19, 1999) (plaintiff would not suffer irreparable harm if precluded from competing in interscholastic football for an entire season where he could practice with his team, coach others, or participate in intermural sports and non-school related athletic events); *Revesz ex rel. Revesz v. Pennsylvania Interscholastic Athletic Ass'n, Inc.,* 798 A.2d 830, 836 (Pa. Commw. Ct. 2002) ("The fact that a student is determined ineligible to play interscholastic sports for one year does not necessarily

11

translate into a loss of opportunity to attain college scholarships.") (*citing Adamek v. Pennsylvania Interscholastic Athletic Association,* 426 A.2d 1206 (1981)). Even where an entire team was barred from competing in a state basketball tournament where the team had the opportunity to compete on a huge stage before an audience that would include many college coaches, scouts and recruiters, which Plaintiff's argued consequently meant the students will miss an "irreplaceable opportunity" to gain college scholarships, the court did not find irreparable harm had been established. *St. Patrick High School v. New Jersey Interscholastic Athletic Association,* Civ. A. No. 10-CV-948, 2010 WL 715826, at *5 (D.N.J. Mar. 1, 2010). The Court recognized the significance of those opportunities, but rejected the argument, finding that such opportunities do not rise to the type of harm injunctive relief is intended to remedy. *Id.* (*citing Dziewa v. Pa. Interscholastic Ath. Ass'n.,* No. CIV.A. 08-5792, 2009 WL 113419 (E.D.Pa. Jan. 16, 2009), at *7 (finding potential college admissions and scholarship opportunities "are speculative, and not the kind of harm that preliminary injunctions were fashioned to address.")).

In this instant matter, Plaintiffs allege that A.M. and/or female athletes may be deprived of *"opportunities for scholarships, recognition, and advancement in their sports careers."* (ECF No. 15-1, p. 5) (emphasis added). However, Plaintiff does not allege any facts to show actual harm to A.M. There are no allegations that A.M. lost a scholarship, may qualify for a scholarship but for the participation of L.A., or any real or immediate harm. Plaintiff does not identify any coherent harm. Instead, Plaintiff's allegations of "irreparable harm" are speculative at best, and are not enough to meet the long-standing Third Circuit standard.

Plaintiff cites multiple times during the current 2024-2025 school year where she was "forced to complete" against L.A. *Id.*  However, Plaintiff cites only <u>one</u> instance where L.A. "took first in the race, A.M. took second." Other than this conclusory, vague statement that lacks any

indication of alleged harm, Plaintiff has not even closely demonstrated any harm. Plaintiff does not allege that A.M. was deprived of anything other than coming in first place in one track meet between two local schools.

Plaintiff then cites multiple future dates where A.M. is likely to be forced to race against L.A. without alleging any harm pertaining to A.M.'s participation in these future track meets. (ECF No. 15-1, p. 6). It is pure speculation that A.M. will be harmed in any way by L.A.'s participation in future track meets. The alleged harm assumes that A.M. competes in future track meets, *in the same event* as L.A. The alleged harm assumes that A.M. will lose scholarships and/or prestige that has not come to fruition nor is supported by any facts. It is unknown how A.M. will perform as compared to L.A. at future track meets or if either of them will even compete in the same event again, or at all. Even if L.A. were to be more successful than A.M. at these future track meets, there are no facts or evidence alleged that show any harm let alone "irreparable harm." Plaintiff has not alleged that A.M. would miss out on an actual scholarship and/or has been contacted by college recruiters regarding the same.

A.M. is a senior and would have likely been already contacted and/or have a scholarship opportunity presented to her, if she qualified for the same, on or prior to the Fall of 2024. A.M. does not allege that she was "forced to complete" against L.A. prior to the current school year. Plaintiff has presented no law, nor any argument that supports anything more than a remote or speculative possibility of future harm and thus cannot prove *any* irreparable harm.

In addition, data from MileSplit indicates that L.A.'s performance in track and field and cross country meets has not negatively impacted A.M.'s performance or the performance of any other female athletes performing in these meets, as more fully supported by the affidavit. Furthermore, to the best of the knowledge of Ralph C. Bretz, Jr., Assistant Principal and Athletic

Director at PWHS, college recruiters for running teams (both track and cross country), review and consider an athlete's race times throughout their season, watching for consistency of times across the duration of the season to account for outlier conditions or performances. *Id.* at ¶¶ 1, 27. College recruiters do not attribute as much, if any, weight to how many times an athlete is on a podium, or whether the athlete's teammates are of the same caliber so that they are winning team matches consistently. *Id.* at ¶ 27.

For the foregoing reasons, Plaintiff cannot establish that A.M. has suffered irreparable harm.

C.    **The Balance of Equities Weighs in Favor of CSD, and Granting Plaintiff's Motion is Not in the Public Interest.**

As described above, it is unlikely that denying Plaintiff's Motion for a TRO will result in irreparable harm to A.M. On the other hand, granting Plaintiff's Motion will likely result in significant harm to students participating in athletics in accordance with their gender identity, including L.A.

As discussed in detail above, the Third Circuit addressed in its decision in *Doe* the harm suffered by transgender students that are forced to use facilities that are not aligned with their gender identities. As Dr. Leibowitz testified in *Doe*, requiring transgender students to use facilities that are not aligned with their gender identities "can exacerbate gender dysphoria symptoms by reinforcing that the 'world does not appreciate or understand' transgender students.'"  *Doe*, 897 F.3d at 524. The Court noted that "[t]here can be 'no denying that transgender individuals face discrimination, harassment and violence because of their identity." *Id.* at 528.  Furthermore, "[t]he Supreme Court has regularly held that the state has a compelling interest in protecting the physical and psychological well-being of minors." *Id.* (citations omitted). It is in the public interest to protect transgender students from discrimination.

Moreover, granting Plaintiff a TRO will thrust this Court into the improper role of a "super school board." It is well established in Pennsylvania that courts are "restrained, when dealing with matters of school policy, by the long-established and salutary rule that courts should not function as super school boards." *Zebra v. School Dist. of the City of Pittsburgh*, 449 Pa. 432, 437 (Pa. 1972). Courts should "not interfere with the discretionary exercise of a school board's power unless the action was based on 'a misconception of law, ignorance through lack of inquiry into facts necessary to form an intelligent judgment or the result of arbitrary will or caprice.'" *Id.* (*quoting Hibbs v. Arsenberg*, 276 Pa. 24, 26 (Pa. 1923)). Policy 256 was not based on a misconception of law, ignorance through a lack of inquiry into facts necessary to form an intelligent judgment and was not arbitrary or capricious. "'It is only when the board transcends the limits of its legal discretion that it is amenable to the injunctive process of a court of equity.'" *Zebra*, 449 Pa. at 750 (*quoting Landerman v. Churchill Area School Dist.*, 414 Pa. 530, 534 (Pa. 1964). Just as the courts in *Upper Saint Clair* and *Delaware Valley* determined, this Court should decline to "overrule the vote" of the Board because "it is not for this Court to substitute its own judgment for that of the elected representatives of the School Board." *Upper Saint Clair*, 2022 WL at *16; *Delaware Valley*, 2021 WL 5239734 at *20 (citation omitted). Granting Plaintiff a temporary restraining order would thus be contrary to the public interest and should therefore be denied.

## III.    <u>CONCLUSION</u>

For all of these reasons, Defendant, Colonial School District, requests that the Court deny Plaintiff's Motion for a Temporary Restraining Order.

                              Respectfully submitted:

Date:  March 3, 2025                  FOX ROTHSCHILD LLP

                              By:_____
                                  Michele Mintz, Esquire
                                  Attorney I.D. #90640
                                  Alexis J. Spurlock, Esquire
                                  Attorney I.D. #322579
                                  980 Jolly Road, Suite 110
                                  P.O. Box 3001
                                  Blue Bell, PA 19422-3001
                                  (215) 397-2237
                                  Fax: (215) 397-0450
                                  mmintz@foxrothschild.com
                                  *Attorneys for Colonial School District*

16