## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HOLLY MAGALENGO on behalf of her daughter, A.M., a minor,** | **CASE NO. 2:25-cv-325** |
| *Plaintiff,* | |
| **v.** | **JURY TRIAL DEMANDED** |
| **PENNSYLVANIA INTERSCHOLASTIC ATHLETIC ASSOCIATION, INC., QUAKERTOWN COMMUNITY SCHOOL DISTRICT, and COLONIAL SCHOOL DISTRICT,** | |
| *Defendants.* | |

## AMENDED COMPLAINT

### I.    INTRODUCTION

This is an action arising from a violation of a student's federal constitutional rights occurring at Quakertown Community High School within the Quakertown Community School District. Plaintiff is seeking damages for the Defendants' violation of her rights.

### II.    PARTIES

1

1.      A.M. is a student at Quakertown Community High School in the Quakertown Community School District in Quakertown, Pennsylvania. Plaintiff at all times material to this litigation has been, and is presently, a minor child.

2.      The Complaint is filed by and through her mother, Holly Magalengo ("Magalengo"), with the consent of A.M.

3.      Defendant Quakertown Community School District ("QCSD") is a public school system located in Quakertown, Pennsylvania. QCSD receives federal funds as a public institution and is governed through its Board of Education. QCSD has received federal funding at all times relevant to this litigation.

4.      Defendant Colonial School District ("CSD") is a public school system located in Plymouth Meeting, Pennsylvania. CSD receives federal funds as a public institution and is governed through its Board of Education. CSD has received federal funding at all times relevant to this litigation.

5.      The Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA"), is the governing body of high school and middle school athletics for the Commonwealth of Pennsylvania, in the United States.

## III.    JURISDICTION & VENUE

6.      This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which provides district courts with jurisdiction over civil actions arising under the United States Constitution or laws of the United States.

2

7.      Venue in this action is properly in the Eastern District of Pennsylvania because the events relevant to this action occurred primarily within the geographical confines of the Eastern District of Pennsylvania.

## IV.    FACTUAL ALLEGATIONS

8.      At all times relevant to this litigation, A.M. was a student at Quakertown Community High School ("QHS") within the Quakertown Community School District ("QCSD").

9.      During the 2024-2025 school year A.M. is a senior and set to graduate in 2025.

10.     QCSD has becoming inundated with diversity, equity, and inclusion ("DEI") curriculum and enrichment since 2020.

11.     A.M. is a member of the QHS girls' cross-country team.

12.     On September 11, 2024, A.M. competed in a cross-country meet at QHS against local high school Plymouth Whitemarsh ("PWMHS").

13.     PWMHS is a high school within CSD.

14.     Defendant CSD and Defendant QCSD operate athletics program that includes separate teams for male and female students.

15.     A biological male was registered to compete in the biological female cross-country meet.

16.     The biological male ("L.A.") is a student at PWMHS.

3

17.    A.M. and L.A. ran competitively against one another during the September 11, 2024, race.

18.    The biological male won the race beating out all of the female athletes.

19.    L.A. took first in the race, A.M. took second.

20.    A.M. stated to L.A. that "You are not a girl. You should not be racing against girls."

21.    PWMHS cross country coaching staff complained to QHS coaching staff about A.M. stating "You are not a girl. You should not be racing against girls" and stated they would be reaching out to QHS Athletic Director Brian Laiacona.

22.    On September 12, 2024, A.M.'s parents reach out to QHS for support in removing biological males from competing in female sports and protecting female athletes.

23.    QHS Athletic Director responded stating "Different sports organizations and governing bodies have various policies in place to address concerns with yours, aiming to create an environment where all athletes can complete. The PIAA Bylaws in Article XVI Section 4E states: Where a student's gender is questioned or uncertain, the decision of the Principal as to the student's gender will be accepted by the PIAA.' The decision for which team their student athlete competes under, is the decision of the Plymouth Whitemarsh SD Administration which we do not control."

24. Dr. Jason Bacani, the principal of Plymouth Whitemarsh High School provided that the biological male was a biological female and allowed to compete with the females.

25. The Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA"), is one of the governing bodies of high school and middle school athletics for the Commonwealth of Pennsylvania, in the United States.

26. The PIAA took PWMHS's stance that the biological male was in fact a biological female.

27. L.A. is in fact a biological male.

28. QHS, PWMHS and PIAA allowed a biological male to compete against biological female athletes.

29. On December 13, 2024, A.M was again subjected to violations of her equal protection rights when she had to compete against L.A. in the 4X400 during the DVGTCA Meet.

30. On February 19, 2025, A.M was again subjected to violations of her equal protection rights when she had to compete against L.A. in the 4x400 during the DVGTCA Tim Hickey Meet of Champions 2025 Jane and David Ott Center, Philadelphia, PA.

31.    On April 29, 2025, A.M. was again subjected to violations of her equal protection rights when she had to compete against L.A. in multiple races, including but not limited to the 800m open, a race that L.A. previously did not compete in.

32.    PWMHS and the PIAA again allowed the biological male to race in a women's race providing that L.A. was a female.

33.    A.M. was harmed by the Defendants' actions.

34.    A.M. and L.A. will continue to compete against each other throughout the Spring 2025 track season until the Defendants are stopped.

**Retained Male-Advantage in Men Who Identify as Transgender**

35.    Women and men are not biologically equal:

"A stabilization of the gender gap in world records is observed after 1983, at a mean difference of 10.0% ± 2.94 between men and women for all events. The gender gap ranges from 5.5% (800-m freestyle, swimming) to 18.8% (long jump). The mean gap is 10.7% for running performances, 17.5% for jumps, 8.9% for swimming races, 7.0% for speed skating and 8.7% in cycling. The top ten performers' analysis reveals a similar gender gap trend with a stabilization in 1982 at 11.7%, despite the large growth in participation of women from eastern and western countries, that coincided with later- published evidence of state-institutionalized or individual doping. These results suggest that women will not run, jump, swim or ride as fast as men."

Thibault V, Guillaume M, Berthelot G, Helou NE, Schaal K, Quinquis L, Nassif H, Tafflet M, Escolano S, Hermine O, Toussaint JF. Women and Men in Sport Performance: The Gender Gap has not Evolved since 1983. J Sports Sci Med. 2010 Jun 1;9(2):214-23. PMID: 24149688; PMCID: PMC3761733.

36.     "Retained Male Advantage" refers to the retention of sport performance enhancing advantages of being biologically male that persist after testosterone suppression and other "gender affirming hormone treatment" ("GAHT").

37.     The reason for sex-separated sport (*i.e.*, for creating separate men's and women's teams or a separate women's category) and the reason the Title IX regulations endorse sex-separated sports teams is to give women a meaningful opportunity to compete that they would be otherwise denied were they required to compete against men.

38.     Biological differences between men and women prevent meaningful competition between men and women and deprive women of any realistic equality of opportunity absent sex-separation of women's teams in the sports of Women's Basketball, Women's Cross Country, Women's Golf, Women's Gymnastics, Women's Soccer, Women's Swimming & Diving, Women's Tennis, Women's Track & Field and Women's Volleyball conducted by the MWC.

39.     Developmental biologist Dr. Emma N. Hilton and sport physiologist Dr. Tommy R. Lundberg report that "the performance gap between males and females . . . often amounts to 10 – 50% depending on sport." Hilton, E.N., Lundberg, T.R., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine* (2021) 51:199-214, p. 199.

7

40.     Hilton and Lundberg note that the sport performance gap between men and women is not limited to certain sports but applies generally to most skills necessary for success in sport. *Id*. Here is a chart that illustrates male sport performance advantages across a wide group of discrete sport skills:



Fig. 1  The male performance advantage over females across various selected sporting disciplines. The female level is set to 100%. In sport events with multiple disciplines, the male value has been averaged across disciplines, and the error bars represent the range of the advantage. The metrics were compiled from publicly available sports federation databases and/or tournament/competition records. *MTB* mountain bike

Reproduced from: Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine*, (2021) 51:199-214, p. 202, Fig. 1.

41.     The source of male athletic performance advantages over women (sometimes described as the "Male-Female Sport Performance Gap") is attributed by many scientists to genetic differences between males and females and the effects higher levels of testosterone have on the male body throughout male development.

42.     The developmental and physiological effects brought about by

genetic differences between males and females and higher levels of circulating testosterone in males begin well before puberty.

43.     In the womb and in the 6–9 month "mini puberty" phase immediately post birth, natal males experience endogenous synthesis and secretion of higher levels of testosterone than natal females, triggering differentiation in male body structure beginning even before birth.

44.     The result "is a clear sex difference in both muscle mass and strength even adjusting for sex differences in height and weight. On average women have 50% to 60% of men's upper arm muscle cross-sectional area and 65% to 75% of men's thigh muscle cross-sectional area, and women have 50% to 60% of men's upper limb strength and 60% to 80% of men's leg strength. Young men have on average a skeletal muscle mass of >12 kg greater than age-matched women at any given body weight."[32] The impact of these differences is "an obvious performance enhancing effect, in particular in sports that depend on strength and (explosive) power, such as track and field events."[33]

45.     Also, "levels of circulating hemoglobin are androgen-dependent and consequently higher in men than in women by 12%[.]"[34] Increased levels of hemoglobin are due to the fact that, "[t]estosterone increases secretion of and sensitivity to erythropoietin, the main trophic hormone for erythrocyte production and thereby hemoglobin synthesis[.]"[35] These effects from testosterone and

erythropoietin "[i]ncreas[e] the amount of hemoglobin in the blood [with] the biological effect of increasing oxygen transport from lungs to tissues, where the increased availability of oxygen enhances aerobic energy expenditure. This is exploited to its greatest effect in endurance sports    It may be estimated that as a result the average maximal oxygen transfer will be ~10% greater in men than in women, which has a direct impact on their respective athletic capacities."[36]

46.    Further, due to the impacts of testosterone, and perhaps other factors, on male development, "on average men are 7% to 8% taller with longer, denser, and stronger bones, whereas women have shorter humerus and femur cross-sectional areas being 65% to 75% and 85%, respectively, those of men."[37] The athletic advantages conferred by men's larger and stronger bones includes, "greater leverage for muscular limb power exerted in jumping, throwing, or other explosive power activities" and greater male protection from stress fractures.[38]

47.    Additionally, there is a sex difference in pulmonary function which "may be largely explained by the androgen-sensitive difference in height, which is a strong predictor of lung capacity and function."[39]

48.    There are many ways to illustrate the Male-Female Sport Performance Gap and demonstrate that men competing on women's teams is incompatible with equal opportunities for women.

49.     A point of comparison that helps put the Male-Female Sport Performance Gap in perspective is to understand that *every* woman's world record in *every* track and field event is bested *every* year by dozens, and in many cases hundreds, of high school age males. *See* Coleman, D.L., Joyner, M.J., Lopiano, D., "Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule," *Duke Journal of Genera Law & Policy*, Vol. 27:69-134, p. 89.

50.     As demonstrated in the chart, in a single year tens of thousands of males outperformed the best female 400m runners in the world.

51.     Here is a table which shows that high school boys ages 14-15 have eclipsed many women's world records by large margins:

**Table 3**  Selected junior male records in comparison with adult elite female records

| Event | Schoolboy male record | Elite female (adult) record |
|---|---|---|
| 100 m | 10.20 (age 15) | 10.49 |
| 800 m | 1:51.23 (age 14) | 1:53.28 |
| 1500 m | 3:48.37 (age 14) | 3:50.07 |
| Long jump | 7.85 m (age 15) | 7.52 m |
| Discus throw | 77.68 m (age 15) | 76.80 m |

*M* meters
Time format: minutes:seconds.hundredths of a second

Reproduced from: Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," Sports Medicine, (2021) 51:199-214, p. 204, Table 3.

52.     These examples reflect that the plain language of Title IX which speaks in terms of binary, biological sex (*i.e.*, male and female) is supported by science.

53.     Peer reviewed scientific research papers also confirm testosterone suppression does not bridge the Male-Female Sport Performance Gap.

54.     In one peer reviewed article researchers studied the effects of a year of hormone suppression on males and found that while males on hormone suppression experienced some reduction in muscle mass, they "generally maintained their strength levels."[40]

55.     In another report, researchers Hilton and Lundberg concluded "that under testosterone suppression regimes typically used in clinical settings, and which comfortably exceed the requirements of sports federations for inclusion of transgender women in female sports categories by reducing testosterone levels to well below the upper tolerated limit, *evidence for loss of the male performance advantage*, established by testosterone at puberty and translating in elite athletes to a 10–50% performance advantage, *is lacking*."[41]

56.     Hilton and Lundberg continued:
Rather, the data show that strength, lean body mass, muscle size and bone density are only trivially affected. The reductions observed in muscle mass, size, and strength are very small compared to the baseline differences between males and females in these variables, and thus, there are major performance and safety implications in sports where these attributes are competitively significant. These data significantly undermine the delivery

of fairness and safety presumed by the criteria set out in transgender inclusion policies, particularly given the stated prioritization of fairness as an overriding objective (for the IOC). If those policies are intended to preserve fairness, inclusion and the safety of biologically female athletes, sporting organizations may need to reassess their policies regarding inclusion of transgender women.

57.    Peer reviewed scientific studies confirm testosterone suppression does relatively little to mitigate the strength, speed, size, power and other athletically relevant differences between men and women (*i.e.*, the Male-Female Sport Performance Gap).

58.    A review published in April 2023 reported there have been a total of 19 published peer reviewed research reports on the effects of testosterone suppression (as part of gender affirming hormone treatment or "GAHT") on performance.[42]

59.    "Collectively, the existing research indicates that while GAHT affects biology, the changes it creates are minimal compared to the initial biological differences between typical males and typical females, which means that both biological attributes and performance differences are retained even after years of GAHT." *Id*.

60.    "In spite of testosterone suppression in transwomen reducing circulating hemoglobin concentration to the levels of reference women, all of these reviews came to the conclusion that even after 3 years of testosterone suppression there are still lasting male athletic advantages in transwomen." *Id*.

13

**The Former PIAA Transgender Policy Was Discriminatory on Its Face**

61.    The former PIAA Transgender Policy provided: "Where a student's gender is questioned or uncertain, the decision of the Principal as to the student's gender will be accepted by PIAA."

62.    Because the former PIAA policy specifically authorized males to compete in sex-separated women's sports the PIAA policy violated Title IX and were facially discriminatory under the Equal Protection Clause of the Fourteenth Amendment.

63.    Further, by allowing men to compete in sex-separated women's sports, men are given access to women's safe and private spaces, including their bathrooms/locker rooms.

64.    The former PIAA policy deprived women of the required separate and comparable facilities by allowing men to access such facilities and deprive the women using them of bodily privacy.

65.    Specifically in terms of the requirements for women to have competitive opportunities "which equally reflect their abilities," equal "opportunities to engage in. . . post-season competition," and equal opportunities for public recognition, the former PIAA policy breached Title IX and violated the Fourteenth Amendment by permitting men to compete against women in women's competitions where a man may rely upon inherent aspects of their maleness,

including physical and athletic advantages, to take women's places, titles and public recognition, which Title IX and the Fourteenth Amendment requires to be protected for women and made equally available to them.

66.    Therefore, Plaintiff is entitled to a declaratory judgment that it was unlawful for Quakertown and the Plymouth Whitemarsh to rely upon or implement the former PIAA policy as an eligibility rule for women's teams in sex-separated sport.

67.    The former PIAA policy, which the PIAA abandoned in February 6, 2025, were founded on the false premise that trans-identifying men could fairly and safely compete against women.

**The Current PIAA Transgender Policy Is Discriminatory As-Applied**

68.    On January 20, 2025, President Donald J. Trump issued an Executive Order No. 14168 titled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

69.    Executive Order No. 14168 stated that "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."

70.    Executive Order No. 14168 defined "women," "woman," "girls," "girl," "female," "men," "man," "boys," "boy" and "male" in purely biological terms.

71.    Executive Order No. 14168 also recognized that the term and concept "gender identity" "reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

72.    On February 5, 2025, President Trump issued an Executive Order No. 14201 titled *Keeping Men out of Women's Sports*, Executive Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025).

73.    Executive Order No. 14201 incorporated the definitions of male and female in Executive Order No. 14168 and stated that "[i]t shall … be the policy of the United States to oppose male competitive participation in women's sports."

74.    Executive Order No. 14201 directed the Secretary of Education to "take all appropriate action to affirmatively protect all-female athletic opportunities and all-female locker rooms and thereby provide the equal opportunity guaranteed by Title IX of the Education Amendments Act of 1972."

75.    In February 2025, the PIAA revised its transgender policy for student-athlete eligibility following the Trump Administration's executive order."

76.    However, the newly adopted PIAA rule did not track President Trump's Executive Orders as the PIAA promised.

77.    The new 2025 PIAA transgender policy provides: "Where a student's sex is questioned or uncertain, the decision of the school as to the student's sex will be accepted by PIAA."

78.    The PIAA provides that their new policy is in accordance with the Presidential Executive Order 14201 entitled 'Keeping Men Out of Women's Sports' … schools are required to consult with their school solicitors relative to compliance with the Order.

79.    The new PIAA policy fails to define "women" or "men" based on biological facts which opens the door to numerous administrability problems.

80.    This careless and not administrable method of defining eligibility for women's teams is sure to create a host of problems when applied.

81.    The PIAA requires schools to determine the students' sex for athletic participation.

82.    The schools have the ability to rely solely upon a clearly insufficient mechanism, the submission of written birth records, to verify eligibility compete on a sex-separated women's team.

83.    By defining "sex assigned at birth" as the designation that is "marked on their birth records," by failing to define "woman," "female," "man," or "male"

on the basis of biology, and by failing to apply any reliable standard for determining the sex of those competing on women's teams, the PIAA's new rule allows males to compete on women's teams in athletics if they obtain an updated birth certificate that reflects their gender identity instead of their sex.

84.    A male can change the sex or gender designation marked on his birth record to "female" without difficulty in over half of the states in the United States.

85.    At least twenty-six (26) states and the District of Columbia (including Colorado) allow a person to change the sex marked on their birth records through administrative procedures permitted by state law.

86.    In at least fourteen (14) states (including California and Idaho), no medical documentation whatsoever is necessary.

87.    The new PIAA policy reference to sex does not close the glaring loophole created by the open-ended phrase "marked on their birth record."

88.    Whatever sex may have been noted on original birth records will not typically be reflected on any available birth record once it is changed through a state-sanctioned process.

89.    Thus, like the former PIAA policy, the new PIAA policy also violates Title IX and the Fourteenth Amendment.

**Title IX Applies to Quakertown, Plymouth Whitemarsh and to Women's Sports Governed by the PIAA**

18

90.     Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

91.     Thus, Title IX specifies that equal educational opportunities are to be allocated, measured and equalized "on the basis of sex."

92.     The statute is understood to require the allocation of equal opportunities *based on biological sex alone without regard to or consideration of gender identity*.

**Title IX Protects Equal Opportunity for Women in Sport**

93.     Title IX protects equal opportunity for women's athletics programs and opportunities.

94.     As the Title IX regulations enacted soon after the law was passed recognize, due to inherent biological differences women must be affirmatively protected with sex-separated sports teams, competitions, championships, and bathrooms/locker rooms to achieve equality and equal opportunity for women.

95.     Title IX presumes that there are only two sexes, male and female.

96.     Pursuant to 34 CFR § 106.33 "separate toilet, locker room, and shower facilities . . . provided for students of one sex shall be comparable to such facilities provided for students of the other sex."

19

97.     At all relevant times Quakertown provides and has provided athletic programs separated by sex.

98.     At all relevant times Plymouth Whitemarsh provides and has provided athletic programs separated by sex.

99.     At all relevant times the PIAA Women's Track and Cross-Country programs are and were an athletic program separated by sex.

100.    At all relevant times the Quakertown women's cross country and track program is and was an athletic program separated by sex.

101.    At all relevant times the Plymouth Whitemarsh women's cross country and track program is and was an athletic program separated by sex.

102.    Title IX's implementing regulations and guidance require that, if an entity subject to Title IX provides athletic programs or opportunities separated by sex, then it must do so in a manner that "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

103.    One aspect of assessing "equal athletic opportunity for members of both sexes" is ascertaining, **"[w]hether the** selection of sports and **levels of competition effectively accommodate the** interests and **abilities of both sexes**." 34 C.F.R. § 106.41(c)(1) (emphasis added).

104.    On the effective accommodation prong, the "governing principle" is that "the athletic interests and abilities of male and female students must be equally

**effectively accommodated**." 44 Fed. Reg. 71,413, 71,414 (1979) (the "Policy Interpretation") (emphasis added).

105.    More specifically, the covered entity (in this case the PIAA and each member institution that receives federal financial assistance) must accommodate the physical abilities of girls and women "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." *Id*. at 71,417-418.

106.    As another aspect of equal athletic opportunity, implementing regulations and guidance state that male and female athletes "should receive equivalent treatment, benefits and opportunities." Policy Interpretation, 44 Fed. Reg. 71,414 (emphasis added).

107.    Factors two through ten of 34 C.F.R. § 106.41(c) are used to evaluate "equal" teams. The "equal treatment" to which girls and women are entitled includes equal "opportunities to engage in . . . post-season competition," id. at 71,416, equal opportunities for public recognition, 34 C.F.R. § 106.41(c), and the right to be free of any policies which are "discriminatory in . . . effect" or that have the effect of denying "equality of athletic opportunity." Id. at 71,417.

108.    Accordingly, Title IX and its implementing regulations currently in effect prohibit men from competing against women in women's sports competitions covered by Title IX where a man may rely upon inherent aspects of their maleness,

including physical and athletic advantages, to take women's places, titles and public recognition, which Title IX requires to be protected for women and made equally available to them.

109.    All high schools under the PIAA purview that are open to enrollment of both sexes has men's cross country and track programs.

110.    There are currently no known women student-athletes competing on a men's team at PIAA member institutions in the sports of Men's Cross Country or Men's Track & Field (Indoor), Men's Track & Field (Outdoor).

111.    The most significant reason that women overwhelmingly are unable to effectively compete for roster spots, scholarships, and recognition on men's teams in these sports is biological: male competitive advantage derived from vast physiological differences between men and women.

## IV.    CAUSES OF ACTION

**COUNT I – Title IX Deprivation of Equal Opportunities and Bodily Privacy**

(Against CSD and QCSD)

112.    Plaintiff restates each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set out herein.

113.    As explained above, the former PIAA transgender policy which the Quakertown and Plymouth Whitemarsh applied without change was facially

discriminatory because it allowed men to compete on women's cross country and track teams.

114.    Further, the PIAA transgender policy is invalid on its face and violates Title IX because it severely limits QCSD and CSD and any of its other member schools from being able to verify whether men are competing on women's teams.

115.    The PIAA policy is a "don't ask, don't tell" rule that severely limits verification of whether men are competing against women.

116.    Because L.A. is a trans-identifying male, and for the reasons discussed above, CSD, acting through its employees, through the addition of L.A. to its women's cross country and track teams, and the PIAA's authorization of CSD to do so, deprived women on the QCSD Team of equal competitive opportunities, playing time, recognition, and scholarships by giving competitive opportunities, playing time, recognition and a scholarship opportunities to L.A.

117.    Likewise, L.A.'s participation on the CSD Team deprived women on other PIAA teams of competitive opportunities and recognition because L.A. has insuperable performance advantages which stem directly from L.A.'s biological maleness and which allow for greater explosiveness, greater speed

and increased stamina than other woman cross country and track athletes could realistically match.

118.    During the fall 2024 season the L.A. beat out Plaintiff in the 400m open, L.A. taking first, A.M. taking second.

119.    CSD's success during the 2024/2025 season is a direct result of L.A.'s membership on the team and the effect of the PIAA transgender policy.

120.    L.A. had a demonstrable and statistically verified impact on the success of CSD's Team.

121.    L.A.'s continued participation on the CSD Team skewed the results of the league in violation of Title IX.

122.    Plaintiff was injured by the foregoing violations of Title IX and are entitled to actual, compensatory, consequential, nominal and punitive damages and to declaratory and injunctive relief.

123.    Wherefore, Plaintiff requests the Court grant them the relief requested in their prayer for relief below.

**COUNT II – Title IX Deprivation of Equal Opportunities and Bodily Privacy**

**Pursuant to 42 U.S.C. § 1983**

(Against PIAA)

124.    Plaintiff restates each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set out herein.

125.    Title IX is further applicable to the PIAA pursuant to 42 U.S.C. § 1983 to the extent that these defendants were acting under color of law in connection with adopting and enforcing the PIAA transgender policy, applying the former PIAA transgender policy, permitting L.A. to be eligible for participating on the CSD Team, and rostering L.A. on the CSD Team.

126.    42 U.S.C. § 1983 states, in relevant part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

127.    The PIAA may be held accountable under 42 U.S.C. § 1983 for actions which violate Title IX where they collaborate or participate in a Title IX violation for which a state actor may also be held responsible.

128.    At all times relevant to the Amended Complaint, PIAA acted under color of state law by engaging in the alleged conduct under Count II.

129.    Plaintiff has been injured by the foregoing violations of Title IX and are entitled to damages and declaratory relief.

130.     Wherefore, Plaintiff requests the Court grant the relief requested in their prayer for relief below.

## COUNT III –Deprivation of Equal Opportunities under the Fourteenth Amendment Equal Protection Clause Pursuant to 42 U.S.C. § 1983

(Against All Defendants)

131.     Plaintiff restates each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set out herein.

132.     The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination on the basis of sex.

133.     Under the Equal Protection Clause, a classification based on sex is subject to heightened scrutiny and can be lawful only if the classification serves an important interest and is substantially related to the achievement of that interest.

134.     42 U.S.C. § 1983 states, in relevant part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

135.    The PIAA, Quakertown and Plymouth Whitemarsh applied the former

PIAA's policy and otherwise permitted their member institutions to roster

trans-identifying men on women's athletic teams during intra- and inter-

conference competition thereby taking women's opportunities and invading

their private spaces. In doing so, they discriminated against women and in

favor of men. These actions do not serve an important interest and are not

substantially related to achieving any important interest.

136.    CSD adopted the PIAA policy, applying the PIAA policies and

practices to permit a trans-identifying man, L.A., to take women's

opportunities and invade their private spaces. In doing so, they discriminated

against women and in favor of men. These actions do not serve an important

interest and are not substantially related to achieving any important interest.

137.    QCSD adopted the PIAA policy, applying the PIAA policies and

practices to permit a trans-identifying man, L.A., to take women's

opportunities and invade their private spaces. In doing so, they discriminated

against women and in favor of men. These actions do not serve an important

interest and are not substantially related to achieving any important interest.

138.    CSD rostered a trans-identifying man, L.A., on the CSD Women's

Team thereby taking women's opportunities and allowing L.A. to invade their

private spaces. In doing so, CSD discriminated against women and in favor of

men. These actions did not serve an important interest and are not substantially related to achieving any important interest.

139.    At all times relevant to the Amended Complaint, the PIAA, Quakertown and Plymouth Whitemarsh acted under color of state law by engaging in the alleged conduct under Count III.

140.    Plaintiff has been injured by the foregoing violations of the Equal Protection Clause and are entitled to damages and to declaratory relief.

141.    Wherefore, Plaintiff requests the Court grant them the relief requested in their prayer for relief below.

## COUNT IV – Fourteenth Amendment Bodily Privacy Violations Pursuant to 42 U.S.C. § 1983

(Against All Defendants)

142.    Plaintiff restates each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set out herein.

143.    There is a sex-based constitutional right to bodily privacy because most people have a special sense of privacy in their body and involuntary exposure of it in the presence of people of the other sex may be especially demeaning and humiliating.

144.    By adopting and/or enforcing the former PIAA transgender policy, adopting the PIAA transgender policy, permitting trans-identifying men to participate in PIAA competition, and rostering a trans-identifying male on the CSD Team, allowing the CSD team to compete against QCSD, the PIAA, CSD and QCSD discriminated against women by allowing men who identified as transgender to access women's bathroom/locker rooms and live with female student-athletes without telling those female student-athletes that they would be sharing a bathroom/locker room with a male, to the detriment and humiliation of women.

145.    The PIAA, CSD and QCSD intentionally authorized and enabled a male student athlete who identifies as transgender, L.A., to access women's bathroom/locker rooms and room with female student-athletes to the detriment and humiliation of women.

146.    The PIAA, CSD and QCSD acted with deliberate indifference to and with reckless disregard for the bodily privacy rights of Plaintiff.

147.    At all times relevant to the Amended Complaint, PIAA, CSD and QCSD acted under color of state law by engaging in the alleged conduct under Count VI.

148.    Plaintiff has been injured by the foregoing violations of the Equal

Protection Clause and are entitled to damages and declaratory relief for the

conduct alleged under Count VI.

149.    Wherefore, Plaintiffs request the Court grant them the relief requested

in their prayer for relief below.

## VI.    PRAYER FOR RELIEF

WHEREFORE,    Plaintiff    respectfully requests    the    following    relief:

a)  A declaration that the former PIAA transgender policy and the current PIAA

transgender policy as applied by PIAA violate Title IX.

b)  A declaration that the PIAA violated Title IX.

c)  A declaration that the CSD violated Title IX.

d)  A declaration that QCSD violated Title IX.

e)  A declaration that the PIAA, CSD and QCSD violated the Equal Protection

Clause.

f)  A declaration that the former PIAA transgender policy and the current PIAA

transgender policy violates the Equal Protection Clause of the United States

Constitution on its face.

g)  A declaration that the PIAA transgender policy violates Equal Protection

Clause of the United States Constitution as applied to the QCSD and CSD

women's cross country and track teams and players.

h) A declaration that the PIAA transgender policy purposefully discriminates based on sex in violation of the Equal Protection Clause of the United States Constitution.

i) A declaration that any male student-athlete is ineligible to compete in women's cross country and track within the purview of the PIAA.

j) A permanent prohibitory injunction forbidding the PIAA, CSD and QCSD and their agents and employees from enforcing or attempting to enforce the PIAA transgender policy.

k) A permanent prohibitory injunction forbidding the PIAA, CSD and QCSD and their agents and employees from enforcing or attempting to enforce the current PIAA transgender policy in any manner that permits member institutions to allow the rostering and participation of male athletes on women's teams.

l) Actual, compensatory, consequential, nominal, exemplary and punitive damages pursuant to 42 U.S.C. §1983, the United States Constitution, and Title IX from the Defendants.

m) An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988 and Title IX.

n) Such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues stated in this action.


Dated: May 6, 2025.                    Respectfully Submitted,

                                       */s/ Solomon Radner*
                                       Solomon Radner, Esq. (*admitted pro hac vice*)
                                       THE LAW OFFICE OF KEITH ALTMAN
                                       33228 West 12 Mile Road, Suite 375
                                       Farmington Hills, Michigan 48334
                                       Telephone: (248) 987-8929
                                       solomonradner@kaltmanlaw.com

                                       *Attorney for Plaintiff*


                                       Devon M. Jacob, Esq.
                                       PA BAR # 89182
                                       Jacob Litigation, Inc.
                                       P.O. Box 837
                                       Mechanicsburg, Pa. 17055-0837
                                       Telephone: (717) 796-7733
                                       DJacob@jacoblitigation.com

                                       *Local Counsel for Plaintiff*