**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| AISLIN MAGALENGO, | : | |
| | : | |
| Plaintiff, | : | No. 2:25-cv-00325-WB |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA INTERSCHOLASTIC | : | |
| ATHLETIC ASSOCIATION, INC., | : | |
| QUAKERTOWN COMMUNITY SCHOOL | : | |
| DISTRICT, and COLONIAL SCHOOL DISTRICT, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANT QUAKERTOWN COMMUNITY SCHOOL DISTRICT'S
BRIEF IN SUPPORT OF MOTION TO DISMISS
<u>PLAINTIFF'S AMENDED COMPLAINT</u>**

LEVIN LEGAL GROUP, P.C.

Michael I. Levin, Esquire (PA 21232)
James J. Musial, Esquire (PA 71100)
1800 Byberry Road, Suite 1301
Huntingdon Valley, PA 19006
Phone: 215.938.6378
mlevin@levinlegalgroup.com
jmusial@levinlegalgroup.com
Attorneys for Defendant,
*Quakertown Community
School District*

## **<u>TABLE OF CONTENTS</u>**

<u>PAGES</u>

TABLE OF AUTHORITIES………………………………………………………………..ii-iv

I.    FACTUAL BACKGROUND……..………………………………………………1

II.   STANDARD OF REVIEW…………………………………………………………2

    A. Federal Rule of Civil Procedure 12(b)(6)…………………………………………2
    B. Federal Rule of Civil Procedure 12(b)(7)…………………………......……………3
      (a)  Persons Required to Be Joined if Feasible……..……………………………...3
      (b) When Joinder is Not Feasible ……....…………………………….....................3

III.  ARGUMENT

    A.  The Equal Protection Clause Does Not Serve to Exclude Students From
       Participation In Publicly Funded Sporting Events....……………………....……5

    B.  Magalengo's Claims Set Forth Under Title IX in Count I of Her Amended
       Complaint Must Be Dismissed As to Quakertown Pursuant to Fed. R. Civ. P.
       12(b)(6) For Failure to State a Claim For Relief ..…………………………….…7

    C.  Magalengo's Claims Set Forth Under 42 U.S.C. § 1983 Must Be Dismissed As
       to Quakertown Pursuant to Fed. R. Civ. P. 12(b)(6) For Failure to State a Claim
       For Relief Because Magalengo Has Not Identified Any Official Policy or Custom
       of Quakertown to Support a Claim Against Quakertown………………………..10

    D.  Magalengo's Amended Complaint Must Be Dismissed Pursuant to Fed. R. Civ. P.
       12(b)(7) and Fed. R. Civ. P. 19(a)(1) For Failure to Join a Necessary Party and
       Under Important Abstention Considerations…………..………………....……15

          (1) The Court Should Abstain Under *Railroad Commission v. Pullman, Co*.,
            312 U.S. 496 1941)……..………………………………………….16
            (a) Sensitive area of state policy: Transgender participation in school
               athletics……………………………………………………..16
            (b) Unsettled issues of state law exist………………………………..17
            (c) State law might render constitutional ruling …………………… 17
          (2) Federalism and Comity Support Abstention…………………………17
          (3) The PHRC as a Necessary Party……………………………………...19

    E.  Magalengo's Claims for Punitive Damages Set Forth in Prayer For Relief,
       Paragraph 1, Must Be Dismissed Because Such Claims May Not Lie Against
       Government Entities……………………………………………………………..25

IV.   CONCLUSION………………………………………………………………..25

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Ashcroft v. Iqbal,* 556 U.S. 662, 678,129 S.Ct. 1937, 1950 (2009) ........................2, 8

*Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 761 (3d Cir. 2019)......................14

*Carswell v. Borough of Homestead*, 381 F.3d 235, 244-245 (3d Cir. 2004).............14

*Colorado River Water Conservation Dist. V. United States,* 424 U.S. 800, 814
(1976) ................................................................................................................ 18

*County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959)...................17, 18

*Craig v. Thomas Jefferson Univ.*, 2009 WL 2038147, *2 (E.D. Pa. 2009)..................2

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239, 142 S. Ct. 2228,
2247 (2022)..........................................................................................................6

*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529, 533 (3d Cir. 2018)...............9

*Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)......................................................16

*Epsilon Energy USA, Inc. v. Chesapeake Appalachia*, LLC.Pittsburgh,
80 F.4th 223 (3d Cir. 2023)..................................................................................4

*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975).....................................17

*Fowler v. UPMC Shadyside,* 578 F.3d 203, 210, 211 (3d Cir. 2009) ........................ 2, 3

*Harris Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 83 (1975)................................17

*Heritage Farms, Inc. v. Solebury Township*, 671 F.2d 743 (3d Cir. 1982)..................19

*Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)....................................................2

*Hoy v. Angelone*, 720 A.2d 745, 749 (Pa. 1998)........................................................25

*Klein v. Weidner*, 729 F.3d 280, 289-290 (3rd Cir. 2013)...........................................25

*Logistics Sys., Inc. v. C.R. Eng., Inc.*, 669 F.Supp.2d 613, 617, 618
(W.D.Pa. 2009) ..................................................................................................4,5

*Marran v. Marran*, 376 F.3d 143, 156 (3d Cir. 2004)................................................13-14

*Martinez v. Bynum*, 461 U.S. 321, 329-330, 103 S. Ct. 1838, 1843 (1983)..............17

*McGovern v. City of Philadelphia*, 554 F.3d 114, 115, 121 n.5 (3d Cir. 2009) ..........2, 14

*Monell v. Dep't of Soc. Servs.*, 98 S. Ct. 2018, 2037-2038 (2018)...........................14

*McLaughlin v. Rose Tree Media School Dist.*, 1 F.Supp.2d 476, 483 (E.D.Pa. 1998)..................................................................................................................24

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)...............................................................................................................18

*Nicole B. School Dist. of Phila.*, 237 A.3d 986, 989 (Pa. 2020)..............................22

*Pittsburgh Logistics Sys., Inc. v. C.R. Eng., Inc.*, 669 F.Supp.2d 613, 617, 618 (W.D.Pa. 2009)...................................................................................................4, 5

*Phillips v. County of Allegheny*, 515 F.3d 224, 234-35 (3d Cir. 2009).......................3

*PIAA v. Campbell*, 2024 Pa. LEXIS 1087, *30-31 (Pa. 2024)....................................12

*Railroad Commission v. Pullman, Co.,* 312 U.S. 496 (1941)....................................16

*Richardson v. Jones*, 551 F.2d 918, 926-928 (3rd Cir. 1977)....................................25

*Taylor v. Phoenixville School Dist.*, 113 F.Supp.2d 770, 777 (E.D.Pa. (2000) ..........25

*Tillman v. Milwaukee*, 725 F.2d 354 (7th Cir. 1983)....................................................24

*Twombly v. Bell Atlantic Corp.,* 550 U.S. 544, 555 (2007).......................................2

*Washington v. Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258, 117 S. Ct. 2302 (1997)..................................................................................................................6

**Statutes and Other Authorities:**

Title IX of the Education Amendment Act of 1972 ("Title I)....................................1, 7, 9, 12

Equal Protection Clause of the Fourteenth Amendment....................................1, 5-6, 15, 19

42 U.S.C. § 1983 ("Section 1983")..............................................................1, 5,10-11, 13, 15

Fed.R. Civ.P. 12(b)(6)..................................................................................2, 7,10, 11 n.6, 25

Fed.R. Civ.P. 12(b)(7)...................................................................................................3, 5,15

Fed.R. Civ.P. 19............................................................................................................3, 5

Fed .R. Civ. P. 19(a).......................................................................................................24

Fed .R. Civ. P. 19(a)-(b)..................................................................................................4

Fed .R. Civ. P. 19(a)(1)..................................................................................15, 23

Fed. R. Civ. P. 19(a)(1)(B)(i)......................................................................23-24

Fed. R. Civ. P. 19(a)(1)(B)(ii)...........................................................................24

1 Pa. Code Part II..............................................................................................20

16 Pa. Code § 41.201........................................................................................20

16 Pa. Code § 41.203........................................................................................20

16 Pa. Code § 41.204........................................................................................20

16 Pa. Code § 41.206.......................................................................15, 17, 19-20

16 Pa. Code § 41.206(3)....................................................................................24

Pennsylvania Human Relations Act (PHRA)......................................................18

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 *et seq*..........................19, 23

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 954....................................21

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 955(d)-(e)..........................21

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 956....................................24

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 956(a)...............................19

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 957(f)............................19, 24

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 959(a)-(b)-(d)..................22

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 959.2................................21

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 960....................................22

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 962(c)...............................22

Pennsylvania Human Relations Act (PHRA), 43 P.S. § 962(c)(1)..........................22

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| AISLIN MAGALENGO, | : | |
| | : | |
| Plaintiff, | : | No. 2:25-cv-00325-WB |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA INTERSCHOLASTIC | : | |
| ATHLETIC ASSOCIATION, INC., | : | |
| QUAKERTOWN COMMUNITY SCHOOL | : | |
| DISTRICT, and COLONIAL SCHOOL DISTRICT, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANT QUAKERTOWN COMMUNITY SCHOOL DISTRICT'S
BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Defendant, Quakertown Community School District ("Quakertown"), submits this Brief in Support of its Motion to Dismiss Plaintiff's Amended Complaint [ECF No. 33], pursuant to FED. R. CIV. P. 12(b)(6) and 12(b)(7).

## I.    FACTUAL BACKGROUND

The Plaintiff, Aislin Magalengo ("Magalengo") alleges in her Amended Complaint that Quakertown violated Plaintiff's rights under Title IX of the Education Amendment Act of 1972 ("Title IX") [ECF No. 33, Count I], the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 ("Section 1983") [ECF No. 33, Count III], and her right to "Bodily Privacy" under the Fourteenth Amendment [ECF No. 33, Count IV]. The gist of Magalengo's Amended Complaint is that Quakertown violated her rights when Quakertown, the Colonial School District ("Colonial") and the Pennsylvania Interscholastic Athletic Association ("PIAA") (a) allowed a transgender girl in Colonial, identified as L.A., to compete in races against Magalengo [ECF No. 33, ¶'s 12-13, 15-19, 27-32, 118] and (b) authorized and enabled L.A. to

access women's bathroom/locker rooms and room with female students athletes. [ECF No. 33, ¶ 145] As for the former claim, Magalengo alleges that L.A. bested her in one race. [ECF No. 33, ¶'s 17-19] As to the latter claim, no such instances are alleged to have occurred, either involving Magalengo or any non-party cisgender female athlete.

## II.    STANDARD OF REVIEW

### A. FED. R. CIV. P. 12(b)(6).

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint for failure to state a claim upon which relief can be granted. When it appears from the face of a pleading that the plaintiff can prove no set of facts that would entitle herm to relief, the Court must dismiss plaintiff's claims. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *McGovern, v. City of Philadelphia*, 554 F.3d 114, 115 (3rd Cir. 2009) (citing cases). Rule 12(b)(6) requires the Court to "accept as true all well-pleaded allegations of fact in the plaintiff's complaint and must view any reasonable inferences that may be drawn therefrom in the light most favorable to the plaintiff." *Craig v. Thomas Jefferson Univ.*, 2009 WL 2038147, *2 (E.D. Pa. 2009) (citing cases). However, the "factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level" and the plaintiff must do more than provide a "formulaic recitation of the elements of a cause of action…." *Twombly v. Bell Atlantic Corp.,* 550 U.S. 544, 555 (2007).

In *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1950 (2009), the Supreme Court reiterated that "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Under *Iqbal*, a court must apply a two-step analysis when evaluating a Rule 12(b)(6) motion. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir. 2009). The first step is to separate the factual and legal elements of the claim. *Id.* The Court "must accept all of the complaint's well-pleaded facts as true, [but it] may disregard any legal conclusions." *Id.* at 210-211. Next, the Court must evaluate

2

". . . whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement *with its facts*." *Id.* at 211 (citing *Iqbal* at 1950; *Phillips v. County of Allegheny*, 515 F.3d 224, 234-35 (3d Cir. 2009)).

In light of the foregoing standard of review, and for the following reasons, Magalengo's Amended Complaint must be dismissed for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6).

## B. FED. R. CIV. P. 12(b)(7).

Federal Rule of Civil Procedure 12(b)(7) provides for the dismissal of a complaint for failure to join a necessary party under Federal Rule of Civil Procedure 19 ("Required Joinder of Parties"). Fed. R. Civ. P. 19 provides, in relevant part:

> **(a) Persons Required to Be Joined if Feasible.**
>> **(1)** *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>>> **(A)** in that person's absence, the court cannot accord complete relief among existing parties; or
>>> **(B)** that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>>>> **(i)** as a practical matter impair or impede the person's ability to protect the interest; or
>>>> **(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.
>>                    * * *
> **(b) When Joinder Is Not Feasible.** If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
>> **(1)** the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>> **(2)** the extent to which any prejudice could be lessened or avoided by:

3

> (**A**) protective provisions in the judgment;
> (**B**) shaping the relief; or
> (**C**) other measures;
> (**3**) whether a judgment rendered in the person's absence would be adequate; and
> (**4**) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed .R. Civ. P. 19(a)-(b). See, e.g., *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 80

F.4th 223 (3d Cir. 2023), in which the Court succinctly explained:

> [T]he best reading of Rule 19 settles into three steps: 1) Considering the qualifications under Rule 19(a)(1)(A) and (a)(1)(B), should the absent party be joined?; 2) If so, is joinder feasible—that is, can the party be joined without depriving the court of the ability to hear the case?; 3) If joining the party is not feasible, should the action continue in the party's absence or be dismissed? *See Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007); *Provident Tradesmens*, 390 U.S. at 108-09.

*Id*., at 232. As another Court more fully explained:

> "Required parties" under Rule 19(a) are those who are "subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction." Fed. R. Civ. P. 19(a)(1). In considering this clause, the court first determines whether "in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). At this step, the court limits its inquiry to whether it can "grant complete relief to persons *already named* as parties to the action; what effect a decision may have on absent parties is immaterial." *General Refractories*, 500 F.3d at 313 (emphasis in original); *Huber v. Taylor*, 532 F.3d 237, 248 (3d Cir. 2008). Alternatively, the court should consider whether the absent party "claims an interest relating to the subject of the action and is so situated that disposing of the action in that person's absence may (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest," Fed. R. Civ. P. 19(a)(1)(B). **If an absent party is deemed to be necessary under either of these two alternatives, it must be joined if feasible, i.e., it is subject to service of process and its joinder does not deprive the court of jurisdiction.** *General Refractories*, 500 F.3d at 313; *see also Janney Montgomery Scott, Inc. v. Shepard Niles, Inc*., 11 F.3d 399, 405 (3d Cir. 1993).

*Pittsburgh Logistics Sys., Inc. v. C.R. Eng., Inc.*, 669 F.Supp.2d 613, 617 (W.D.Pa. 2009)

(emphasis added).

4

It must be further observed that, "In reviewing a Rule 12(b)(7) motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the non-moving party." *Id.*, at 618 (citing Third Circuit cases). "The assumption of truth does not apply, however, to legal conclusions couched as factual allegations or to [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* (quoting *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1950 (2009)). Finally, "*A court making a Rule 19 determination may consider evidence outside the pleadings*." *Id.* (emphasis added).

The application of Fed. R. Civ. P. 12(b)(7) and Fed. R. Civ. P. 19 to the present facts, as stated below, establishes that Magalengo's Amended Complaint should be dismissed for its failure to join a necessary party.

## III.    ARGUMENT

### A. The Equal Protection Clause Does Not Serve to Exclude Students From Participation In Publicly Funded Sporting Events.

Asserting two Section 1983 claims under the Equal Protection Clause of the 14th Amendment against Quakertown,[1] Magalengo has the audacity of attempting to use a constitutional provision adopted to protect individual rights to deny such rights to transgender youth.

---

[1] In Count IV of her Amended Complaint, Plaintiff alleges that the defendants violated her right to "bodily privacy" under the Equal Protection Clause of the Fourteenth Amendment [ECF No. 33, ¶ 148]. Plaintiff also alleges certain conduct "under Count VI" [ECF No. 33, ¶'s 147-148]; however, there is no Count VI in the Amended Complaint. The Amended Complaint also includes two Section IV's, so the second Count IV ("Causes of Action") presumably is intended as Section V.

The Equal Protection Clause provides that ""No State shall ... deny to any person within its jurisdiction the equal protection of the laws." This clause, ratified in 1868, is part of the Reconstruction Amendments, adopted in the aftermath of the Civil War to secure civil and political rights for formerly enslaved persons and to limit states' power in matters of fundamental rights. The Equal Protection Clause was designed to constitutionalize the principles behind the Civil Rights Act of 1866, which declared that all persons born in the United States were citizens and were to enjoy the same rights as white citizens. There is nothing in the text or history of the Equal Protection Clause that it could be used to say to a transgender girl, "you are not welcome to run in this race" because Magalengo objects.

The history behind the Equal Protection clause is important because the Supreme Court has repeatedly echoed that constitutional provisions must be read in their historical context. *E.g. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239, 142 S. Ct. 2228, 2247 (2022) (declining to find that abortion was encompassed without the word "liberty" because it was not deeply rooted in Nation's history); *Washington v. Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258, 117 S. Ct. 2302 (1997) (declining to find a right to assisted suicide embraced in the Due Process clause after concluded that it was not deeply rooted in nation's history).

In this case, Magalengo is claiming the constitutional right under the Equal Protection clause to say who she competes against! The Equal Protection clause, by its text and by its historical context, was not meant or intended to apply to after school sporting events and rules that allow both cisgender and transgender students to enjoy the experience.

Magalengo is essentially arguing, without any precedent to base her claims, that the Plaintiff is entitled to be provided with a "girls" team that only cisgender girls can be on and from which transgender girls must be excluded. There is nothing in history supporting such an

6

interpretation of the Equal Protection clause. For this reason alone, Magalengo's claims asserted under the Fourteenth Amendment must be dismissed.

## B. Magalengo's Claims Set Forth Under Title IX in Count I of Her Amended Complaint Must Be Dismissed As to Quakertown Pursuant to Fed. R. Civ. P. 12(b)(6) For Failure to State a Claim For Relief.

Magalengo claims in Count I that Quakertown violated Title IX simply because it was subject to the PIAA Bylaws that provided Plymouth-Whitemarsh Principal Bacani and Plymouth-Whitemarsh with the authority to determine L.A.'s eligibility to participate on Plymouth-Whitemarsh's girls cross country and track teams. As more fully explained in footnote 6, below, Magalengo alleges that PIAA's former 2024-2025 Bylaws and its current (revised) 2024-2025 Bylaws -- which she misleadingly refers to as "PIAA's Former Transgender Policy" and "PIAA's Current Transgender Policy" -- violated her rights under Title IX by providing, respectively, that "Where a student's gender is questioned or uncertain, the decision of the Principal as to the student's gender will be accepted by PIAA," and "Where a student's sex is questioned or uncertain, the decision of the school as to the student's sex will be accepted by PIAA."

Title IX provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" Magalengo's Amended Complaint is devoid of any allegations that she has been excluded from participation in any cross country or track competition. Otherwise, she merely asserts a legal conclusion that the

"PIAA transgender policy"[2] "was facially discriminatory because it allowed men to compete on women's cross country and track teams." [ECF No. 33, ¶113] Aside from ignoring that L.A. is a transgender female, Magalengo provides no factual details as to how she was caused to suffer discrimination on the basis of her sex due to L.A.'s participation on Plymouth-Whitemarsh's girls cross country or track teams. Magalengo also asserts in conclusory fashion that "PIAA authorization of [Colonial School District] [to permit] the addition of L.A. to its women's cross country and track teams" "deprived women on the QCSD Team of equal competitive opportunities, playing time, recognition, and scholarships[.]" [ECF No. 33, ¶ 116][3] No facts are alleged to explain how or when, or even if, any of these things actually occurred in the first instance.[4] Magalengo does not even allege that *she*, in addition to the non-plaintiff "women on the QCSD Team," was deprived of anything. What Magalengo seeks, in essence, is a ruling that L.A.

---

[2] She fails to identify whether she is intending to refer to what she has termed the "The former PIAA Transgender Policy" [ECF No. 33, ¶ 61; See, Fn. 6, below] or "The new 2025 PIAA Transgender Policy" [Id., ¶ 77; See, Fn. 6, below].

[3] As the Supreme Court has settled:

> [T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation.)"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

[4] Similarly, Plaintiff claims that "L.A.'s participation on the CSD Team deprived [non-plaintiff] women on other PIAA teams of competitive opportunities and recognition[.] [ECF No. 33, ¶, 117] There are no facts alleged to explain what is meant by "competitive opportunities" or "recognition," let alone when or how, of if, such ever occurred.

should have been and be excluded from competing on the Plymouth-Whitemarsh cross country and track teams on the basis of sex. As the Third Circuit Court has held, the State has a compelling right to protect transgender students from discrimination. *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018) ("School District had a compelling state interest in protecting transgender students from discrimination.") The context in that case was that Title IX does not serve to support a claim of violation of a cisgender female student's bodily privacy due to the presence of a transgender female in the same locker room or bathroom. *Doe v. Boyertown Area Sch. Dist.*, at 533 ("We also agree with the School District's position that barring transgender students from locker rooms that align with their gender identity would itself pose a potential Title IX violation.")[5] Although Quakertown had no authority to prevent L.A. from doing so under either version of the PIAA Bylaws, it is hard to imagine that Title IX would not likewise protect L.A. from discrimination based on sex with respect to her participating on Plymouth-Whitemarsh's girls cross country and track teams. For each of these reasons, the Magalengo's claims asserted under Title IX must be dismissed.

---

[5] The Third Circuit also held that the plaintiff cisgender students' claim that their right to privacy was violated by the School District's policy of permitting transgender students to use bathrooms and locker rooms that aligned with their gender identities did not result in any violation of their Constitutional right to privacy. *Id.*, at 527-528. The Court noted that "The constitutional right to privacy is not absolute." *Id.* The Court agreed with the District Court's ruling that the policy "would not give rise to a constitutional violation because the School District's policy served a compelling interest—preventing discrimination against transgender students—and was narrowly tailored to that interest." *Id.* Although the PIAA's Bylaws are not a policy of Quakertown in any event, the same reasoning expressed in *Doe* should apply as well to the PIAA's "Former Transgender Policy" and "Current Transgender Policy," as so termed by Plaintiff.

9

**C. Magalengo's Claims Set Forth Under 42 U.S.C. § 1983 Must Be Dismissed As to Quakertown Pursuant to Fed. R. Civ. P. 12(b)(6) For Failure to State a Claim For Relief Because Magalengo Has Not Identified Any Official Policy or Custom of Quakertown to Support a Claim Against Quakertown.**

Magalengo alleges that Quakertown violated her Equal Protection rights because a transgender girl raced against her or competed at the same track meets as her. Conspicuously absent from the Amended Complaint is any allegation that Quakertown had any role, power or authority in determining whether L.A. could race. Absent from the Amended Complaint are any allegations of any involvement or action by Quakertown, other than its team showing up to a race and its students racing. Absent from the Amended Complaint is any allegation that Quakertown had any ability to do anything about whether the transgender athlete ran in the races.[6] We have

_____

[6] Plaintiff alleges that the School District's Athletic Director responded to her parents when they contacted him the day after the cross-country race: "The PIAA Bylaws in Article XVI Section 4E states [sic]: 'Where a student's gender is questioned or uncertain, the decision of the Principal as to the student's gender will be accepted by the PIAA.' The decision for which team their student athlete competes under, is the decision of the Plymouth Whitemarsh SD Administration which we do not control." [ECF No.1, ¶'s 22-23] Plaintiff's Amended Complaint then alleges that, "Dr. Jason Bacani, the principal of Plymouth Whitemarsh High School provided that the biological male was a biological female and allowed to compete with the females." [Id., ¶ 24] Next, Plaintiff alleges that, "The Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA"), is one of the governing bodies of high school and middle school athletics for the Commonwealth of Pennsylvania, in the United States." [Id., ¶ 25] In fact, at the time of the September 11, 2024 cross country race, and the December 13, 2024 and February 19, 2025 4X400 relay races alleged in the Amended Complaint, the PIAA Bylaws allegedly referenced by the School District's Athletic Director to Plaintiff's parents provided as follows: "Where a student's gender is questioned or uncertain, the decision of the Principal as to the student's gender will be accepted by PIAA." (See, PIAA 2024-2025 Constitution and Bylaws, at Article XVI Section 4E, page 38, a true and correct copy of which is attached hereto as **Exhibit "A."**) Plaintiff quotes and references this in her Amended Complaint as "The former PIAA Transgender Policy." [Id., ¶ 61]) Accordingly, given PWMHS Principal Dr. Jason Bacani's adherence and exercise of his authority pursuant to the governing PIAA Bylaws regarding high school student L.A., it is clear that Quakertown had no such authority to exercise, either to prevent or to allow L.A. to compete in the subject cross country race or the two 4X400 relay races. The same is equally true with respect to the PIAA 2024-2025 Constitution and Bylaws, as revised on February 21, 2025 (a true and correct copy of which is

been unable to find a single case that stands for the proposition that a school district is liable under Section 1983 because of what others have decided regarding participants in a race or any other sporting event.

PIAA, and not Quakertown, possesses and exercises authority over the schools involved with respect to these high school athletic competitions. As more fully explained by Pennsylvania's Supreme Court:

> Here, despite the existence in Pennsylvania of other athletic organizations with a more limited scope in terms of subject matter or geography, *PIAA is the de facto state-wide regulator of high school athletics*. Its membership consists of over 1,400 schools, including, by PIAA's own description, almost all of the public junior high/middle and senior high schools, some of the Charter and Private junior high/middle Schools, and many of the Charter and Private senior high Schools in the Commonwealth of Pennsylvania. The interscholastic competitions held

---

attached hereto as **Exhibit "B"**), which would have applied to the track competition alleged in Plaintiff's Amended Complaint as occurring on April 29, 2025. [Id., ¶ 31]. Plaintiff quotes and references this as "The new 2025 PIAA Transgender Policy [which] provides: 'Where a student's sex is questioned or uncertain, the decision of the school as to the student's sex will be accepted by PIAA.'" [Id., ¶ 77]) Plaintiff alleges that "In February 2025, the PIAA revised its transgender policy …," [Id., ¶ 75] but fails to include the date of its revision on February 21, 2025 – two days following the February 19, 2025, 4X400 relay race alleged in ¶ 30 of the Amended Complaint. A copy of this revised "Handbook – Section II-PIAA Constitution and Bylaws," and notice of its update on "2/21/2025," are published on PIAA's website at https://www.piaa.org/resources/handbook/default.aspx. The subject revision replaced the former references to "a student's gender" with "a student's sex" and the former reference to "Principal" with "school" -- the new provision still appearing at Article XVI Section 4E, page 38 of the PIAA Bylaws. Accordingly, where the decision regarding L.A.'s "gender" when "questioned or uncertain" previously was reserved to her school principal, Dr. Jason Bacani, the decision regarding L.A.'s "sex" when "questioned or uncertain" since February 21, 2025, has been reserved to her school, PWMHS. Accordingly, given PWMHS' adherence and exercise of its authority pursuant to the current governing PIAA Bylaws regarding high school student L.A., it is clear that Quakertown had no such authority to exercise, either to prevent or to allow L.A. to compete in the April 29, 2025, track competition alleged in the Amended Complaint. Given the absence of any factual allegations in the Amended Complaint to demonstrate that Quakertown had such authority to exercise, either to prevent or to allow L.A. to compete in *any* of the competitions alleged in the Amended Complaint, under either the former or current PIAA Bylaws, respectively, all claims against Quakertown should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

pursuant to PIAA's governance involve the participation of more than 350,000 school students in Pennsylvania. *PIAA provides uniform standards for all interscholastic levels of competition, and it governs virtually all aspects of interscholastic middle- and high-school sports in Pennsylvania. It sets eligibility rules and makes eligibility decisions* based on a student's age, amateur status, attendance, parental consent, pre-participation physical evaluation, transfers and residence, the period of participation (semesters and seasons), and academic performance. PIAA is also responsible for the rules of the sports involved, it provides officials (referees) for the competitions, and it acts as the governing board for the examination of persons seeking to become an official. The Commonwealth Court thus appropriately concluded that *PIAA exercises statewide control over high school athletics.*

*PIAA v. Campbell*, 2024 Pa. LEXIS 1087, *30-31 (Pa. 2024) (italics added).

Accordingly, it is clear that while Quakertown and Plymouth-Whitemarsh both were and remain subject to PIAA's Bylaws, Quakertown had no authority to exercise or override the decisions of Plymouth-Whitemarsh Principal Bacani concerning L.A.'s eligibility to compete in those events.

Magalengo seeks to sidestep this glaring reality by alleging that "Quakertown and Plymouth Whitemarsh applied ["the former PIAA transgender policy"] without change…." [ECF No. 33, ¶ 113][7] Again of course, Quakertown had no authority or even discretion to do anything in regard to applying or not applying either the "Former PIAA transgender policy" or the "Current PIAA transgender policy."

Magalengo makes similar allegations that "it was unlawful for Quakertown and the Plymouth Whitemarch [sic] to rely upon or implement the former PIAA policy…." [ECF No. 33,

---

[7] Plaintiff makes this bald allegation in Count I of her Amended Complaint entitled "Title IX Deprivation of Equal Opportunities and Bodily Privacy." Of course, in the remaining Counts against Quakertown, she incorporates "each and every allegation set forth in the preceding paragraphs of this Complaint…." [ECF No. 33, Count III, ¶ 131, Count IV, ¶ 142]

¶, 66] And again, that: "QCSD [Quakertown] adopted the PIAA policy, applying the PIAA policies and practices to permit a trans-identifying man, L.A., to take women's opportunities and invade their private spaces." [ECF No. 33, ¶ 137] Magalengo goes so far to allege against Quakertown, that:

> By adopting and/or enforcing the former PIAA transgender policy, adopting the PIAA transgender policy, permitting trans-identifying men to participate in PIAA competition, and rostering a trans-identifying male on the CSD Team, allowing the CSD team to compete against QCSD, the PIAA, CSD and QCSD discriminated against women by allowing men who identified as transgender to access women's bathroom/locker rooms and live with female student-athletes without telling those female student-athletes that they would be sharing a bathroom/locker room with a male, to the detriment and humiliation of women.

[ECF No. 33, ¶ 144] In addition to the lack of any authority or even discretion under the PIAA Bylaws for Quakertown to adopt or enforce the former or current "PIAA transgender policy" with respect to L.A.'s participation as a member of Plymouth-Whitemarsh's girls cross country and track teams, this allegation does not include any facts whatsoever to show when, or even if, L.A. (or any other "men who identified as transgender") accessed a women's bathroom or locker room or lived with female student-athletes – and most particularly, with respect to any such occasion involving Magalengo.

Consequently, despite Magalengo's disingenuous attempt to cast PIAA's Bylaws as a matter of Quakertown policy, the Magalengos' Section 1983 claims against Quakertown should be dismissed. As a matter of long-settled law, it is required for a Section 1983 plaintiff to identify a specific policy, practice or custom of a School District that allegedly resulted in the claimed violation of her civil right(s) guaranteed by Section 1983. *See. e.g*., *Marran v. Marran*, 376 F.3d 143, 156 (3d Cir. 2004):

> Assuming, *arguendo*, that Librett properly alleged a constitutional violation, Librett did not allege that a policy or custom of the [Montgomery County Office

> of Children and Youth] led to the violation. This is an essential part of a §
> 1983 claim against a county. Without an allegation of a policy or custom, Librett
> has not stated a *prima facie* case, and the District Court properly dismissed the
> claim without permitting discovery.

*See also*, *Monell v. Dep't of Soc. Servs.*, 98 S. Ct. 2018, 2037-2038 (2018) ("[It] is when execution

of a government's policy or custom, whether made by its lawmakers or by those whose edicts or

acts may fairly be said to represent official policy, inflicts the injury that the government as an

entity is responsible under § 1983."); *Carswell v. Borough of Homestead*, 381 F.3d 235, 244-245

(3d Cir. 2004) ("There must be "a direct causal link between a municipal policy or custom and the

alleged constitutional deprivation."") (citing *Brown v. Muhlenberg Township*, 269 F.3d 205, 214

(3d Cir. 2001) (quoting *City of Canton*, 489 U.S. at 385); and *Baloga v. Pittston Area Sch. Dist.*,

927 F.3d 742, 761 (3d Cir. 2019):

> The District next argues that even if Baloga can establish a constitutional
> violation, the District itself could not be held liable because there is no evidence
> that any municipal policy or custom caused that violation. *See Monell*, 436 U.S.
> at 690-91. A municipality may be held liable pursuant to 42 U.S.C. § 1983 only
> if a plaintiff is able to identify such a policy or custom. *See A.M. ex rel. J.M.K.*
> *v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004). That
> requires a plaintiff to show, for a policy, **that an official with final decision-**
> **making authority has "issue[d] an official proclamation, policy, or**
> **edict,"** *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990), or, for a
> custom, that a course of conduct, though not authorized by law, was "'so
> permanent    and    well    settled'    as    to    virtually    constitute
> law," *id.* (quoting *Monell*, 436 U.S. at 690). **In either case, the policymaker,**
> **as defined under state law, must be "responsible either for the policy or,**
> **through acquiescence, for the custom."** *Andrews*, 895 F.2d at 1480-81.
> (emphases added)

As held by the Third Circuit Court in *Marran*, *supra*, omission of the necessary factual

allegations to support a plaintiff's Section 1983 claim is not excused simply because discovery has

not been completed. *See also*, *McGovern v. City of Philadelphia*, 554 F.3d 114, 121 n.5 (3d Cir.

2009):

14

> McGovern's assertion that he should be entitled to discovery in order to marshal facts to support his theory that the City discriminated against him pursuant to an official policy or custom is misguided. Our review of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is limited to the contents of the complaint. *Yarris v. County of Delaware*, 465 F.3d 129, 134 (3d Cir. 2006). Nowhere in his complaint does McGovern allege that the City maintained a policy or custom to retaliate against or otherwise mistreat Caucasian employees. Absent such an allegation, McGovern has not stated a *prima facie* case, and the District Court properly dismissed the claim without permitting discovery.

Because Magalengo's Amended Complaint makes no factual allegation of any policy or custom of the School District that deprived her of rights to which she claims entitlement, these claims set forth against Quakertown in Counts III and IV of her Amended Complaint, should be dismissed for failure to state a claim for relief, pursuant to Federal Rule of Civil Procedure 12(b)(6).

### D. Magalengo's Amended Complaint Must Be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(7) and Fed. R. Civ. P. 19(a)(1) For Failure to Join a Necessary Party and Under Important Abstention Considerations.

Magalengos bring this Equal Protection claim under 42 U.S.C. § 1983, not to apply existing law, but to create new law! Plaintiff unabashedly asserts in the Joint Report filed in this case that "Plaintiff's position is that the Plaintiff is trying to create new law." [ECF 27, p. 10] The "new law" that they seek to establish is that school districts across the Commonwealth of Pennsylvania (and presumably the country) must exclude transgender girls from participating on sports teams and in sporting events that are conducted under the auspices of public school districts, the PIAA, and regarding anti-discrimination requirements, the Pennsylvania Human Relations Commission ("the PHRC"). By doing so, Magalengo implicitly seeks to challenge the meaning and interpretation to be given to relevant state regulations by the PHRC that protect transgender athletes' participation in gender-aligned sports teams. 16 Pa. Code § 41.206. As a result,

Quakertown requests that the Court abstain or, alternatively, find that the PHRC is a necessary party that must be joined by Magalengo.

### (1) The Court Should Abstain Under *Railroad Commission v. Pullman, Co.*, 312 U.S. 496 (1941).

Federal courts should abstain from deciding constitutional claims when a potentially dispositive issue of state law could render a constitutional ruling unnecessary. *Pullman* abstention applies when the case presents a sensitive area of social policy best left to the states; state law is unclear or unsettled; and a state court ruling on the state-law issue might obviate the need to decide the constitutional question.

### (a) Sensitive area of state policy: Transgender participation in school athletics

Issues involving gender identity, student participation in extracurricular activities, and school sports governance involve highly sensitive local concerns that implicate educational policy, equality, and parental rights—traditionally regulated by state law. *See Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("control of public school curriculum is committed to the state and local authorities"). The Supreme Court has repeatedly deferred to state and local authorities in the governance of the public school system. In one case, the Court said:

> "No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process. . . . [Local] control over the educational process affords citizens an opportunity to participate in decision-making, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence.'" *Id.*, at 741-742 (quoting *San Antonio Independent School District* v. *Rodriquez*, 411 U.S. 1, 50 (1973)).
>
> The provision of primary and secondary education, of course, is one of the most important functions of local government. Absent residence requirements, there can be little doubt that the proper planning and operation of the schools would

16

> suffer significantly. The State thus has a substantial interest in imposing bona
> fide residence requirements to maintain the quality of local public schools.

*Martinez v. Bynum*, 461 U.S. 321, 329-330, 103 S. Ct. 1838, 1843 (1983).

Although *Martinez* dealt with a residency requirement, the rules governing participation in interscholastic rules require "proper planning and operation" taking into account relevant factors. That should be left to the PIAA, the school districts that participate with the PIAA and the PHRC.

### (b) Unsettled issues of state law exist

State regulations protecting transgender students' rights in athletics, i.e., 16 Pa. Code § 41.206, have not been definitively interpreted by state courts. If a state court were to find that these regulations preclude exclusion of transgender girls from girls' sports, such a ruling could resolve or significantly alter the Equal Protection analysis.

### (c) State law might render constitutional ruling unnecessary

If state courts uphold the regulation under state law or find the exclusion contrary to state anti-discrimination statutes, Magalengo's claim could become moot or substantially narrowed. *See Harris Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 83 (1975) (Pullman abstention appropriate when state court decision could eliminate federal constitutional question).

### (2) Federalism and Comity Support Abstention

This case does not merely seek relief for an individual plaintiff. Rather, it asks this Court to create new federal constitutional doctrine that would undermine or invalidate a state-level regulatory framework enacted to protect a vulnerable class of students. Federal courts must proceed with caution where intervention would disrupt state authority over education and civil rights policy. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) (abstention appropriate where federal adjudication would disrupt state administrative functions). *See also, County of Allegheny v. Frank Mashuda Co*., 360 U.S. 185 (1959) noting that:

17

> This Court has also upheld an abstention on grounds of comity with the States when the exercise of jurisdiction by the federal court would disrupt a state administrative process, *Burford* v. *Sun Oil Co.*, 319 U.S. 315; *Pennsylvania* v. *Williams*, 294 U.S. 176, … or otherwise create needless friction by unnecessarily enjoining state officials from executing domestic policies, *Alabama Public Service Comm'n* v. *Southern R. Co.*, 341 U.S. 341; *Hawks* v. *Hamill*, 288 U.S. 52.

*Id.*, at 189. Abstention is warranted in the present case because the continued exercise of federal Court jurisdiction to resolve what is, in essence, a claim of discrimination based on sex would disrupt the State's own administrative process for resolving such claims pursuant to the policies embodied in the Pennsylvania Human Relations Act (PHRA) and the related regulations of the PHRC, as set forth more fully in Section D(3), below. As the Supreme Court further has explained in regard to the abstention doctrine:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "**difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar**"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be **disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern**." *Colorado River Water Conservation Dist.* v. *United States, supra*, at 814.

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) (discussing the "Burford Doctrine") (emphases added). These factors also strongly militate in favor of this Court's dismissal of Magalengo's Amended Complaint, and in favor of the administrative process provided by the PHRA and PHRC regulations. As the Third Circuit has recognized:

> Burford abstention is appropriate where a difficult question of state law is presented which involves important state policies or administrative concerns. In this situation, a federal court may abstain to avoid disrupting the efforts of a state "to establish a coherent policy with respect to a matter of substantial public concern."

*Heritage Farms, Inc. v. Solebury Township*, 671 F.2d 743 (3d Cir. 1982) (*Burford* citation omitted) (and quoting from *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976). The *Colorado River* Court also held that: "Abstention is appropriate 'in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law.'" *Id.*, at 814 (citing Pullman, supra, and other Supreme Court cases). Such is the case here.

For the foregoing reasons, Defendant respectfully requests that the Court dismiss or stay this action pending resolution of the relevant state law issues in state court.

### (3) The PHRC as a Necessary Party.

In the event that the Court elects not to abstain, Quakertown asserts that no decision whether the regulations run afoul of the Equal Protection Clause should be made in the absence of the Pennsylvania Human Relations Commission ("PHRC"), the body charged in the state with enforcing many important civil rights.

The PHRC is charged with administrative enforcement and compliance with the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 *et seq*. Section 956 of the PHRA provides that, "There shall be, and there is hereby established in the Governor's Office a non-partisan, departmental administrative commission for the administration of this act, which shall be known as the 'Pennsylvania Human Relations Commission,' and which is hereinafter referred to as the 'Commission.'" 43 P.S. § 956(a). The "Powers and duties of the Commission" include, among other things, "To initiate, receive, investigate and pass upon complaints charging unlawful discriminatory practices." *Id.*, at § 957(f). In this regard, the PHRC's regulations identify "sex discrimination" as follows:

16 Pa.Code **§ 41.206. Sex discrimination.**

The term ''sex'' as used in the PHRA … includes all of the following:

(1) Pregnancy.
(2) Sex assigned at birth.
(3) *Gender, including a person's gender identity or gender expression*.
(4) Affectional or sexual orientation, including heterosexuality, homosexuality, bisexuality and asexuality.
(5) Differences of sex development, variations of sex characteristics or other intersex characteristics.

16 Pa.Code Chapter 41, "Subchapter D. Protected Classes," at § 41.206 (emphasis added). The

PHRC Regulations also define "Gender identity or expression:"

*Gender identity* or *expression*—Having or being perceived as having a gender-related identity, appearance, expression or behavior, which may or may not be stereotypically associated with the person's sex assigned at birth. Gender identity or expression may be demonstrated by consistent and uniform assertion of the gender identity or any other evidence that the gender identity is part of a person's core identity.

*Id*., at § 41.204. The purpose of Subchapter D is set forth at § 41.201:

This subchapter ensures that all unlawful discriminatory practices proscribed by the PHRA … are interpreted and applied consistently. This subpart also ensures that all complaints filed with the PHRC are investigated consistent with the rules outlined in this subchapter.

The PHRC Regulations also set forth an "Enforcement" provision, at § 41.203: "This

subchapter shall be subject to and enforced in accordance with the PHRA, … Chapter 42 (relating

to Special Rules of Administrative Practice and Procedure) and 1 Pa. Code Part II (relating to

General Rules of Administrative Practice and Procedure). In addition to the PHRC Regulations,

the PHRA provides that, "If the Commission concludes, at any time following the filing of a

complaint under this act, that prompt judicial action is necessary to prevent immediate and

irreparable harm, the Commission may commence an action in Commonwealth Court or the

appropriate court of common pleas, and that court may grant an appropriate preliminary or special

injunction pending final disposition of the complaint." 43 P.S. § 959.2. The PHRA also provides, as relates to School Districts and other political subdivisions, that:

> It shall be an unlawful discriminatory practice …
>
> > For **any person**, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act [or] For **any person**, employer, employment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

43 P.S. § 955(d)-(e) (emphases added). The Act defines "Person" as including "one or more individuals … and all political subdivisions [e.g., school districts]…." *Id*., at § 954. Section 959 of the Act ("Procedure") provides, in pertinent part, that:

> **(a)** Any person claiming to be aggrieved by an alleged unlawful discriminatory practice may make, sign and file with the Commission a verified complaint, in writing, which shall state the name and address of **the person**, employer, labor organization or employment agency alleged to have committed the unlawful discriminatory practice complained of ….
>
> **(b)**
>
> > **(1)** After the filing of any complaint, or whenever there is reason to believe that an unlawful discriminatory practice has been committed, the Commission shall make a prompt investigation in connection therewith.
> >
> > **(2)** The Commission shall send a copy of the complaint to the named respondent within thirty days from the date of docketing the complaint ….
> >
> > **(3)** A respondent shall file a written, verified answer to the complaint within thirty days of service of the complaint ….
>
> >        \* \* \*
>
> **(c)** If it shall be determined after such investigation that no probable cause exists for crediting the allegations of the complaint, the Commission shall, within ten days from such determination, cause to be issued and served upon the complainant written notice of such determination, and the said

21

complainant or his attorney may, within ten days after such service, file with the Commission a written request for a preliminary hearing before the Commission to determine probable cause for crediting the allegations of the complaint. ….

\* \* \*

**(d)** In case of failure so to eliminate such practice or in advance thereof, if in the judgment of the Commission circumstances so warrant, the Commission shall cause to be issued and served a written notice, together with a copy of such complaint as the same may have been amended, requiring the person … named in such complaint, hereinafter referred to as respondent, to answer the charges of such complaint at a hearing before the Commission at a time and place to be specified in such notice.

43 P.S. § 959(a)-(b)-(d) (emphasis added). Following the issuance of an enforcement order by the

PHRC:

The complainant, the Attorney General or the Commission may secure enforcement of the order of the Commission or other appropriate relief. When the Commission has heard and decided any complaint brought before it, enforcement of its order shall be initiated by the filing of a petition in court ….

43 P.S. § 960 ("Enforcement and judicial review"). Even if the PHRC should determine in a case

that no probable cause exists for its own enforcement of the PHRA, the complainant may then file

a complaint in the court of common pleas alleging the accused party's violation of the PHRA. In

fact, before filing a state court complaint alleging a violation of the PHRA, the complaint is

required to first have exhausted her administrative remedy by filing her claim with the PHRC. See

e.g., *Nicole B. School Dist. of Phila.,* 237 A.3d 986, 989 (Pa. 2020) ("[W]hile an alleged victim of

discrimination may bring an action in the court of common pleas for redress, he or

she must first exhaust administrative remedies under the PHRA. *Id.* § 962(c)(1).") Accordingly,

Section 962(c) provides:

In cases involving a claim of discrimination, if a complainant invokes the procedures set forth in this act, that individual's right of action in the courts of the Commonwealth shall not be foreclosed. If within one (1) year after the filing of a complaint with the Commission, the Commission dismisses

22

the complaint or has not entered into a conciliation agreement to which the complainant is a party, the Commission must so notify the complainant. On receipt of such a notice the complainant shall be able to bring an action in the courts of common pleas of the Commonwealth based on the right to freedom from discrimination granted by this act. [43 P.S. § 962(cc)(1)]

* * *

If, after a trial held pursuant to subsection (c), the court of common pleas finds that a defendant engaged in or is engaging in any unlawful discriminatory practice as defined in this act, the court may award attorney fees and costs to the prevailing plaintiff. [*Id*., at 962(C.3)]

The foregoing provisions make clear that the Pennsylvania Human Relations Commission is a necessary party in this action and should have been joined by Magalengo, pursuant to Fed .R. Civ. P. 19(a)(1) (recited above in **Section B**.)

As a threshold matter, the PHRC is subject to service of process and its joinder would not deprive the court of subject-matter jurisdiction. Next, the PHRC has an interest relating to the subject of the action and is so situated that disposing of the action in its absence may as a practical matter impair or impede its ability to protect that interest. Fed. R. Civ. P. 19(a)(1)(B)(i). The PHRC's interest in this matter is clear. As an administrative agency charged by state law with enforcing the PHRA, including its prohibitions against sex discrimination as defined by the Act to include "Gender, including a person's gender identity or gender expression," and further defined in the statute as "Having or being perceived as having a gender-related identity, appearance, expression or behavior, which may or may not be stereotypically associated with the person's sex assigned at birth. Gender identity or expression may be demonstrated by consistent and uniform assertion of the gender identity or any other evidence that the gender identity is part of a person's core identity." What Magalengo's Amended Complaint seeks to achieve, on the opposite hand, is in effect a ruling that the definition of sex includes only "biological males" and "biological females." A federal ruling in the present Court, or on appeal should that occur, would create

23

nationwide federal law at complete loggerheads with the statutory charge of the PHRC and the PHRA which it is charged with enforcing Fed. R. Civ. P. 19(a)(1)(B)(i). Without the PHRC's joinder, the Commission would have no ability to protect its statutory mission of investigating claims of sex discrimination based on gender identity and gender expression and enforcing the PHRA laws against such discrimination based on sex. See, e.g., *Tillman v. Milwaukee*, 725 F.2d 354 (7th Cir. 1983), where the plaintiff brought suit against the City of Milwaukee seeking injunctive relief and reinstatement to employment and retroactive seniority. The Circuit court held that the Wisconsin Department of Industry, Labor, and Human Relations ("DILHR") was a necessary party pursuant to Fed .R. Civ. P. 19(a), "whose joinder was necessary for the complete adjudication of Tillman's complaint." *Id*., at 355. The Court explained that: "As the essential relief sought by Tillman was 'reinstatement to an apprenticeship program' … 'with retroactive seniority," it is more than obvious that the agency (DILHR) created by statute to supervise, direct and regulate apprenticeship programs and indentures was a necessary party to the determination of what, if any, relief could be afforded the plaintiff-appellant Tillman." *Id*., at 358. In this case, it is the PHRC which was created by statute (43 P.S. § 956) "To initiate, receive, investigate and pass upon complaints charging unlawful discriminatory practices[,]" (*Id*., at 957(f)) including "sex discrimination" as defined in the PHRC's regulations to include "G*ender, including a person's gender identity or gender expression*." 16 Pa.Code § 41.206(3).

As an additional consequence of Magalengo's failure to join the PHRC as a party defendant, a ruling in Magalengo's favor due to the PHRC's inability to protect its interest would leave Quakertown (and Co-defendants) "subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(B)(ii). On the one hand, the School District could be held civilly liable under a nationwide law banning

24

transgender female athletes from competing in athletic competitions with cisgender female athletes, while on the other hand, the School District could be held civilly liable for prohibiting transgender female athletes from competing in athletic competitions with cisgender female athletes (discriminating based on sex in violation of the PHRA as enforced by the PHRC and the state courts).

### E. Magalengo's Claim for Punitive Damages Set Forth in Prayer For Relief, Paragraph l, Must Be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6) Because Such Claims May Not Lie Against Government Entities.

In the "Prayer For Relief" set forth in the Amended Complaint, Magalengo requests, among other things:

> 1) Actual, compensatory, consequential, nominal, exemplary and **punitive damages** pursuant to 42 U.S.C. §1983, the United States Constitution, and Title IX from the Defendants (emphasis added).

Prayer For Relief, Paragraph 1, must be dismissed pursuant to Rule 12(b)(6) because the law is well-settled that claims for punitive damages will not lie against governmental entities. *See, e.g.*, *Taylor v. Phoenixville School Dist.*, 113 F.Supp.2d 770, 777 (E.D.Pa. 2000) (citing *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 267-71, 101 S.Ct. 2748 (1981). *Richardson v. Jones*, 551 F.2d 918, 926-928 (3rd Cir. 1977) (cited in *McLaughlin v. Rose Tree Media School Dist.*, 1 F.Supp.2d 476, 483 (E.D.Pa. 1998); *Hoy v. Angelone*, 720 A.2d 745, 749 (Pa. 1998) (cited in *Klein v. Weidner*, 729 F.3d 280, 289-290 (3rd Cir. 2013). Accordingly, Magalengo's claim for an award of punitive damages from the School District must be dismissed as a matter of law.

## IV.    CONCLUSION

Based upon the foregoing, Defendant Quakertown Community School District, respectfully requests that its Motion for Dismissal of Magalengo's Amended Complaint pursuant

to Fed. R. Civ. P. No. 12(b)(6) and 12(b)(7) be granted and that an Order be entered dismissing

Magalengo's Amended Complaint against Quakertown Community School District with prejudice.

Respectfully submitted,

LEVIN LEGAL GROUP, P.C.

/s/ *James J. Musial*

Date:   May 20, 2025

_____

Michael I. Levin, Esquire
James J. Musial, Esquire
1800 Byberry Road, Suite 1301
Huntingdon Valley, PA 19006
Phone: 215.938.6378
mlevin@levinlegalgroup.com
jmusial@levinlegalgroup.com
Attorneys for Defendant,
*Quakertown Community School District*

26