IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AISLIN MAGALENGO, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | NO. 2:25-CV-00325 |
| | : | |
| PENNSYLVANIA | : | |
| INTERSCHOLASTIC ATHLETIC | : | JURY TRIAL DEMANDED |
| ASSOCIATION, INC., QUAKERTOWN | : | |
| COMMUNITY SCHOOL DISTRICT, | : | |
| and COLONIAL SCHOOL DISTRICT, | : | |
| | : | |
| Defendants | : | |

**REPLY BRIEF OF DEFENDANT PENNSYLVANIA INTERSCHOLASTIC
ATHLETIC ASSOCIATION, INC. IN SUPPORT OF ITS
<u>MOTION TO DISMISS AMENDED COMPLAINT</u>**

McNEES WALLACE & NURICK LLC
Dana W. Chilson
PA I.D. No. 208718
Austin D. Hughey
PA I.D. No. 326309
100 Pine Street, P.O. Box 1166
Harrisburg, PA 17108-1166
(717) 232-8000
dchilson@mcneeslaw.com
ahughey@mcneeslaw.com

Dated:  June 17, 2025

*Counsel for Defendant Pennsylvania Interscholastic
Athletic Association, Inc.*

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ...................................................................................................ii

**I.  ARGUMENT** .......................................................................................................... 1

      A.     PIAA Is Not Subject to Title IX .............................................................. 1

      B.     PIAA's Mixed Gender Participation Policy Is Sex/Gender Neutral And Magalengo Cannot Recover Under A Theory of Disparate Impact Claims ........... 6

      C.     Magalengo Does Not Allege An Invasion Of Her Privacy.................................... 8

**II.  CONCLUSION** ............................................................................................. 10

# TABLE OF AUTHORITIES

**Cases**

*B.P.J. v. West Virginia State Board of Education*,
 98 F.4th 542 (4th Cir. 2024) ........................................................................................ 5

*Cureton v. National Collegiate Athletic Association*,
 198 F.3d 107 (3d Cir. 1988) ................................................................................. 2, 3, 4

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
 897 F.3d 518 (3d Cir. 2018) ......................................................................................... 9

*Dunleavy v. New Jersey*,
 2008 WL 199467 (D.N.J. 2008) .................................................................................. 7

*Hiester v. Fischer*,
 113 F. Supp. 2d 742 (E.D. Pa. 2000) ......................................................................... 7

*Kennedy v. City of Philadelphia*,
 588 F. Supp. 3d 598 (E.D. Pa. 2022) ......................................................................... 7

*Kent v. Henderson*,
 77 F. Supp. 2d 628 (E.D. Pa. 1999) ........................................................................... 7

*National Collegiate Athletic Association v. Smith*,
 525 U.S. 459 (1999) .................................................................................................. 1, 2

*National Collegiate Athletic Association v. Tarkanian*,
 488 U.S. 179 (1988) .................................................................................................. 2, 3

*Pa. Interscholastic Athletic Ass'n, Inc. v. Campbell*,
 310 A.3d 271 (Pa. 2024) .............................................................................................. 4

*Pokrandt v. Shields*,
 773 F. Supp. 758 (E.D. Pa. 1991) ............................................................................... 9

*Smith v. National Collegiate Athletic Association*,
 266 F.3d 152 (3d Cir. 2001) ............................................................................. 1, 2, 3, 4, 5

**Constitutional Provisions & Statutes**

24 P.S. § 5-511 .................................................................................................................. 6

25 P.S. § 16-1604-A .......................................................................................................... 6

W. Va. Code § 18-2-25 ...................................................................................................... 5

**Rules & Regulations**

34 C.F.R. § 106.2 ............................................................................................................................. 2

Defendant Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA"), by and through its counsel, McNees Wallace & Nurick LLC, hereby submits this Reply Brief in response to the Brief of Plaintiff Aislin Magalengo ("Magalengo") in opposition to PIAA's Motion to Dismiss the Amended Complaint. For the reasons set forth in PIAA's Motion to Dismiss, its supporting Brief, and herein, the Motion should be granted, and the Amended Complaint should be dismissed with prejudice.

I.    ARGUMENT

A.    PIAA Is Not Subject to Title IX

Although PIAA does not directly receive federal funds, Magalengo contends that PIAA is subject to Title IX because it controls the athletic programs of its member schools, some of whom may receive federal assistance. (ECF No. 42, Magalengo's Br. at 3). As support for her controlling authority theory, Magalengo cites the Third Circuit's decision in *Smith v. National Collegiate Athletic Association*, 266 F.3d 152 (3d Cir. 2001) ("*Smith II*"). While the Third Circuit did recognize in *Smith II* that Title IX applies to entities that have ceded controlling authority over a federally funded program, the court determined that the National Collegiate Athletic Association ("NCAA") is not subject to Title IX through a controlling authority theory because the NCAA does not "control" its member schools. *Id.* at 156-58. PIAA, like the NCAA, does not control its member schools in the sense required to be subject to Title IX and, therefore, under *Smith II*, PIAA cannot be said to be a recipient of federal assistance and subject to Title IX.

The Third Circuit's decision in *Smith II* followed remand by the United States Supreme Court in *National Collegiate Athletic Association v. Smith*, 525 U.S. 459 (1999) ("*Smith I*"). In *Smith I*, the Court examined the definition of "Recipient" in the regulations to Title IX to

determine whether the National Collegiate Athletic Association ("NCAA") is a recipient of federal funds. The regulations to Title IX define the term "Recipient" as

> any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof.

34 C.F.R. § 106.2. The Court interpreted this definition as "mak[ing] clear that Title IX coverage is not triggered when an entity merely benefits from federal funding." *Smith I*, 525 U.S. at 468. Applying this interpretation to NCAA, the Court determined that NCAA was not a recipient of federal funds merely because its members, which included post-secondary educational institutions that are in receipt of federal funds, paid dues to NCAA. *Id.* The Court reasoned that "[a]t most, the [NCAA's] receipt of dues demonstrates that it indirectly benefits from the federal assistance afforded its members" which "is insufficient to trigger Title IX coverage." *Id.* The Court nonetheless remanded for the Third Circuit to address whether NCAA is subject to Title IX under a theory "that[,] when a recipient cedes controlling authority over a federally funded program to another entity, the controlling entity is covered by Title IX regardless [of] whether it is itself a recipient." *Id.* at 469-70.

On remand, the Third Circuit determined that NCAA is not subject to Title IX under a controlling authority theory because the NCAA does not "control" its member schools. *Smith II*, 266 F.3d at 156-58. In doing so, the Third Circuit relied on its decision in *Cureton v. National Collegiate Athletic Association*, 198 F.3d 107 (3d Cir. 1988), which, in turn, relied on the United States Supreme Court's decision in *National Collegiate Athletic Association v. Tarkanian*, 488 U.S. 179 (1988). In *Cureton*, a student athlete alleged that NCAA's scholastic aptitude test requirements disparately impacted him based on his race and, therefore, violated Title VI of the

2

Civil Rights Act of 1964. *Smith II*, 266 F.3d at 155. The NCAA moved to dismiss the complaint, in relevant part, on the basis that it does not receive federal assistance. *Id.* This Court declined to dismiss the complaint against NCAA, finding that "Title VI covered the NCAA because member schools had vested the NCAA with controlling authority over their federally-funded athletic programs." *Id.*

Upon review of this Court's decision, the Third Circuit reversed, relying on the Supreme Court's decision in *Tarkanian*. In *Tarkanian*, NCAA recommended that a university "suspend its men's basketball coach following the NCAA's investigation into numerous allegations of rules violations." *Smith II*, 266 F.3d at 156. Although the university disagreed with NCAA's recommendation, it ultimately adopted the recommendation and suspended its coach. *Id.* The coach then brought an action against NCAA under Section 1983 claiming that NCAA was a state actor because the university "delegated its functions to the NCAA and ceded its authority both to adopt and enforce rules governing [the university's] athletic programs." *Id.* The Supreme Court rejected the coach's argument that the university is a state actor. In doing so, the Court recognized that although "the NCAA's rules and recommendations clearly influenced [the university], it concluded that the [u]niveristy, not the NCAA, made disciplinary decisions concerning its employees." *Id.* The Court explained in its decision that the university "had choices" – "it could have retained [the coach] in spite of NCAA recommendations and risked sanctions, or it could have voluntarily withdrawn from the NCAA." *Id.*

Based on *Tarkanian*, the Third Circuit in *Cureton*, concluded that NCAA "does not 'control' its members." *Smith II*, 266 F.3d at 156 (quoting *Cureton*, 198 F.3d at 116). The court reasoned that "similar to the personnel and employee decisions at issue in *Tarkanian*, the ultimate decision as to which [students] will participate in varsity intercollegiate athletics

3

belongs to the member schools." *Id.*  The court recognized that "institutions make these decisions cognizant of NCAA sanctions," but determined that because institutions "have the option, albeit unpalatable, of risking sanctions or voluntarily withdrawing from the NCAA" it cannot be said that NCAA controls its member institutions' intercollegiate athletic programs. *Id.* (quoting *Cureton*, 198 F.3d at 116).

In *Smith II*, the Third Circuit determined that "*Cureton* precludes [the student's] 'controlling authority' argument in the context of Title IX," explaining that "[l]ike the *Cureton* plaintiffs, [the student here] alleges that the NCAA exercised controlling authority over its federally-funded member institutions because it had the power to establish rules governing intercollegiate athletics at member schools and made individual eligibility and waiver decisions." *Id.* at 157.  The court rejected this argument given "that NCAA members may choose to enforce or ignore" the NCAA's eligibility rules. *Id.*  Accordingly, the Third Circuit concluded that NCAA does not have controlling authority over the athletic activities of its member schools and, therefore, NCAA is not subject to Title IX under a controlling authority theory.

As determined in *Tarkanian*, *Cureton*, and *Smith II* with respect with NCAA, PIAA here does not have controlling authority over the athletic activities of its member schools.  Like NCAA, PIAA is a "voluntary-member organization." *Pa. Interscholastic Athletic Ass'n, Inc. v. Campbell*, 310 A.3d 271, 274 (Pa. 2024).  Absent from the Amended Complaint are any factual allegations that PIAA controls or directs the athletic activities of its member schools.  Although Magalengo asserts that she "has plausibly alleged that PIAA so substantially controls athletic programs at federally funded institutions as to fall within the scope of Title IX," (ECF No. 42, Magalengo's Br. at 4), Magalengo asserts in her Amended Complaint only that PIAA "is the governing body of high school and middle school athletics for the Commonwealth of

Pennsylvania." (ECF No. 33, Am. Compl. ¶ 5). The Third Circuit made clear in *Smith II* that the fact that an athletic association with "the power to establish rules governing inter[scholastic] athletics at member schools" is not sufficient to find that the association is subject to Title IX under a controlling authority theory. 266 F.3d at 157. Like NCAA, PIAA member schools have the choice of voluntarily withdrawing from PIAA or knowingly violating its rules at the risk of possible sanctions. In light of this, and under the controlling precedent of the Third Circuit, it cannot be said PIAA controls the athletic activities at its member schools.

In support of its argument that PIAA does control the athletic activities at its member schools, Magalengo cites the Fourth Circuit's decision in *B.P.J. v. West Virginia State Board of Education*, 98 F.4th 542 (4th Cir. 2024). However, that matter is readily distinguishable. In *B.P.J.*, the appellants challenged a West Virginia law that, in effect, "prevent[s] transgender girls from playing on girls teams." *Id.* at 550. The Fourth Circuit considered, among other things, whether the West Virigina Secondary Schools Activities Commission ("Commission"), which governs athletic competition among West Virginia's secondary schools, is subject to Title IX under a controlling authority theory. *Id.* at 554. In examining this issue, the court observed that by statute West Virginia county boards of education may "delegate 'control, supervision, and regulation of interscholastic athletic events' to the Commission[.]" *Id.* (quoting W. Va. Code § 18-2-25(b)). Citing this statute, the Fourth Circuit determined that the Commission is subject to Title IX because "it exercises sufficient control over direct funding recipients to make it a Title IX defendant." *Id.* In reaching this conclusion, the court distinguished *Smith II* and NCAA on the basis that NCAA, unlike the Commission "has no statutory authority to control the athletic programs of its member schools." *Id.*

5

Like NCAA, and unlike the Commission, PIAA has no statutory authority to control the athletic activities of its member schools.  While Pennsylvania law allows schools to "*affiliate* with any local, district, regional, State, or national organization whose purposes and activities are appropriate to and related to the school program," 24 P.S. § 5-511(b) (emphasis added), including PIAA, and requires PIAA to adopt certain standards concerning appeals, athletic eligibility, and transfers of students, 25 P.S. § 16-1604-A, Pennsylvania Law, unlike West Virigina law, does not expressly permit schools to cede total control, supervision, and regulation of athletic activities to PIAA.  Again, PIAA is a voluntary membership organization.  Its member schools have the choice of voluntarily withdrawing from PIAA or knowingly violate its rules at the risk of possible sanctions.  Under these circumstances, the Third Circuit has determined that an athletic association is not subject to Title IX under a controlling authority theory. Accordingly, under *Smith II*, Count II of the Amended Complaint should be dismissed with prejudice.

B.      PIAA's Mixed Gender Participation Policy Is Sex/Gender Neutral And Magalengo Cannot Recover Under A Theory of Disparate Impact Claims

In arguing that her equal protection claim against PIAA for sex discrimination should not be dismissed, Magalengo admits that PIAA's Mixed Gender Participation Policy "is relevant to both boy's and girl's athletics."  (ECF No. 42, Magalengo's Br. at 9).  In effect, Magalengo is acknowledging that the policy at issue is sex/gender neutral.

PIAA's former Mixed Gender Participation Policy, located at Article XVI, Section 4, Paragraph E of PIAA's Bylaws provided that "[w]here a student's gender is questioned or uncertain, the decision of the Principal as to the student's gender will be accepted by the PIAA." (ECF No. 33, Am. Compl. ¶ 23).  PIAA's current Mixed Gender Participation Policy was amended to provide that "[w]here a student's sex is questioned or uncertain, the decision of the

6

school as to the student's sex will be accepted by PIAA." (ECF. No. 33, Am. Compl. ¶ 77). The policy is sex/gender neutral. The policy would allow a transgender male student to compete with cisgender males in interscholastic athletic competitions. Further, the determination of such is the same for every student athlete in that the student's school makes such determination.

In order to prevail on an equal protection claim for sex discrimination, "a female plaintiff bears the burden of showing that her 'sex was a substantial factor in the discrimination and that if she had been a male, she would not have been treated in a similar manner.'" *Hiester v. Fischer*, 113 F. Supp. 2d 742, 747 (E.D. Pa. 2000) (quoting *Kent v. Henderson*, 77 F. Supp. 2d 628, 635 (E.D. Pa. 1999)). Given that the policy at issue is sex/general neutral, and given Magalengo's seeming acknowledgment of the same, Magalengo's discrimination claim fails as a matter of law.

In an attempt to maintain her discrimination claim, Magalengo argues that although PIAA's policy may be sex/gender neutral, it "will likely only *impact* girls because, as demonstrated in the [Amended] Complaint, the inherent biological advantages are typically only relevant as it pertains to a male athlete participating in female sports." (ECF No. 42, Magalengo's Br. at 9-10 (emphasis added)). In essence, Magalengo is asserting that PIAA's policy is discriminatory based upon its disparate impact on cisgender females. However, this Court has recognized that "[t]he Constitution protects only against intentional discrimination, and disparate impact clams are rooted in allegations of unintentional discrimination, so they are not actionable under Section 1983." *Kennedy v. City of Philadelphia*, 588 F. Supp. 3d 598, 611 (E.D. Pa. 2022) (citing *Dunleavy v. New Jersey*, 2008 WL 199467, at *5 n.2 (D.N.J. 2008) ("[D]isparate impact claims are actionable only under Title VII (and not [Section] 1983, since constitutional substantive due process protects only against intentional discrimination) . . . .")).

7

Thus, Magalengo's disparate impact argument does not save her discrimination claim given that a discrimination claim based upon a theory of disparate impact is not actionable under Section 1983.

Accordingly, Count III of Magalengo's Amended Complaint should be dismissed with prejudice.

C.    Magalengo Does Not Allege An Invasion Of Her Privacy

Magalengo asserts, without attribution, that her claim against PIAA under Section 1983 for violating the Fourteenth Amendment's protection of bodily privacy should not be dismissed at the motion to dismiss stage because "Constitutional right to privacy cases 'necessarily require fact-intensive and context-specific analyses.'"    (ECF No. 42, Magalengo's Br. at 10-11). However, no fact-intensive or context-specific analysis is required here because Magalengo does not allege an invasion of her privacy in the Amended Complaint.  Although Magalengo submits in her Brief that she "alleges" that as a result of PIAA policy "she was required to use shared locker rooms or bathrooms with a biologically male athlete on [Quakertown Community School District] grounds and at other track meets which were without a policy that offers meaningful alternatives," (ECF, No. 42, Magalengo's Br. at 11), that submission is, at best, misleading.  It is clear from a review of the Amended Complaint that there are no allegations that she shared a locker room or bathroom with L.A.

Here, while Magalengo asserts generally that PIAA's Mixed Gender Participation Policy allows for the invasion of bodily privacy, she does not allege that her bodily privacy was invalided.  Instead, and in contrast to the representation in her brief, Magalengo alleges that "PIAA, [Colonial,] and [Quakertown] discriminated against women by allowing men who identified as a transgender to access women's bathroom/locker rooms and live with female

8

student-athletes without telling those female student-athletes that they would be sharing a bathroom/locker room with a male, to the detriment and humiliation of women." (ECF No. 33, Am. Compl. ¶ 144). Magalengo does not allege she shared a bathroom or locker room with L.A. on September 11, 2024, December 13, 2024, February 19, 2025, or April 29, 2025, or that her bodily privacy rights were otherwise violated. Such makes sense, particularly since L.A. and Magalengo were not on the same team and thus would never have shared a locker room.

Furthermore, even if Magalengo had shared a bathroom with L.A., that fact alone is insufficient to support a privacy claim. While a privacy claim may arise from a policy permitting persons to be viewed by members of the opposite sex while in a state of undress, the Third Circuit rejected the general premise that a person's "constitutional right to privacy is necessarily violated because they are forced to share bathrooms and locker rooms with transgender students whose gender identities correspond with the sex-segregated space, but do not [] align with their birth sex." *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530-31 (3d Cir. 2018). Magalengo does not allege in the Amended Complaint that L.A. ever viewed her in a state of undress in a bathroom, locker room, or otherwise.

In the absence of an allegation that her bodily privacy rights were violated, Count IV of Magalengo's Amended Complaint fails as a matter of law. *Pokrandt v. Shields*, 773 F. Supp. 758, 765 (E.D. Pa. 1991) (setting forth that to maintain a Section 1983 claim the plaintiff must plead, among other things, "that [the] defendant's conduct deprived [the] plaintiff of a right, privilege, or immunity secured by the United States Constitution or law of the United States.").

Additionally, even if Magalengo had plead an invasion of her privacy, she still could not maintain her claim against PIAA because PIAA's Mixed Gender Participation Policy does not contain any instructions or directives as to who may use a particular bathroom or locker room.

PIAA's policy is silent as to bathroom or locker room use. As such, PIAA's Mixed Gender Participation Policy alone does not constitute a violation of the Fourteenth Amendment's protection of bodily privacy. Accordingly, Count IV of Magalengo's Amended Complaint should be dismissed with prejudice.

## II.    CONCLUSION

For the reasons set forth above, as well as the reasons set forth in PIAA's Motion to Dismiss and supporting Brief, PIAA respectfully requests the Court grant its Motion to Dismiss and dismiss Magalengo's Amended Complaint with prejudice.

Respectfully Submitted,

McNEES WALLACE & NURICK LLC

By: _____

Dana W. Chilson
PA I.D. No. 208718
Austin D. Hughey
PA I.D. No. 326309
100 Pine Street, P.O. Box 1166
Harrisburg, PA 17108-1166
(717) 232-8000
dchilson@mcneeslaw.com
ahughey@mcneeslaw.com

Dated: June 17, 2025    *Counsel for Defendant Pennsylvania Interscholastic Athletic Association, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day caused the foregoing document to be served on the

following via the ECF system:

Solomon Radner, Esq.
The Law Office of Keith Altman
solomonradner@kaltmanlaw.com

Devon M. Jacob, Esq.
Jacob Litigation, Inc.
djacob@jacoblitigation.com

*Counsel for Plaintiff*

Michele Mintz, Esq.
Alexis J. Spurlock, Esq.
Fox Rothschild LLP
mmintz@foxrothschild.com
aspurlock@foxrothschild.com

*Counsel for Defendant Colonial School District*

Michael I. Levin, Esq.
James J. Musial, Esq.
Levin Legal Group
mlevin@levinlegalgroup.com
jmusial@levinlegalgroup.com

*Counsel for Defendant Quakertown Community School District*

McNEES WALLACE & NURICK LLC

By: _____
    Dana W. Chilson
    PA I.D. No. 208718

Dated:  June 17, 2025            *Counsel for Defendant Pennsylvania Interscholastic Athletic Association*