## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **AISLIN MAGALENGO,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| | |
| **v.** | |
| | |
| **PENNSYLVANIA INTERSCHOLASTIC** | **NO.  25-325** |
| **ATHLETIC ASSOCIATION, INC.,** | |
| **QUAKERTOWN COMMUNITY** | |
| **SCHOOL DISTRICT, and COLONIAL** | |
| **SCHOOL DISTRICT,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Aislin Magalengo sued Defendants Quakertown Community School District ("Quakertown"), Colonial School District ("Colonial"), and the Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA")—the governing body for high school and middle school athletics teams in Pennsylvania—because a transgender girl was allowed to race against cisgender girls in the 2024-25 cross country and track seasons, pursuant to PIAA policy.[1] Magalengo—a cisgender girl—brings the following: (1) a claim under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq*., against Quakertown and Colonial for depriving her of "Equal Opportunities and Bodily Privacy"; (2) a Title IX claim against PIAA, also for also depriving her of "Equal Opportunities and Bodily Privacy," albeit this claim is purportedly brought under 42 U.S.C. § 1983 ("Section 1983" or "§ 1983");[2] (3) a § 1983 claim

---

[1] Herein, the Court uses the term "'transgender girl' to refer to" a young "individual whose biological sex" assigned at birth "is male, but who identifies as" a girl, and "'transgender boy' to refer to" a young "individual whose biological sex" assigned at birth "is female, but who identifies as" a boy.  *United States v. Skrmetti*, 605 U.S. __, 145 S.Ct. 1816, 1830 n.2 (2025).  The term "cisgender" is used to denote those whose biological sex assigned at birth aligns with their gender identity.

[2] Plaintiff's Amended Complaint labels this claim as "COUNT II – Title IX Deprivation of Equal Opportunities and

against all Defendants for depriving her of "Equal Opportunities under the Fourteenth Amendment Equal Protection Clause"; and, (4) a § 1983 claim against all Defendants for "Fourteenth Amendment Bodily Privacy Violations."

Each Defendant moves to dismiss Magalengo's Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), and Quakertown also moves to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(7) ("Rule 12(b)(7)").

## I.    FACTUAL BACKGROUND

The following factual recitation is taken from Magalengo's Amended Complaint, well-pleaded allegations from which are taken as true at this stage. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

Magalengo was a student on the girls' cross-country team at Quakertown Community High School ("Quakertown High School"), a school within the Quakertown Community School District, where, near the beginning of her final year at Quakertown High School, she competed in a cross-country meet against Plymouth Whitemarsh High School ("Plymouth Whitemarsh"), a high school within the Colonial School District.  At the meet, Magalengo competed against L.A., a transgender girl on Plymouth Whitemarsh's cross country team.  L.A. won the race, with Magalengo coming in second.  On losing to L.A., Magalengo told her: "You are not a girl.  You should not be racing against girls."

Plymouth Whitemarsh coaches complained to Quakertown High School staff about Magalengo's comment and stated they would be reaching out to Quakertown High School's

---

Bodily Privacy Pursuant to 42 U.S.C. § 1983."  Magalengo does not brief how bringing her Title IX claim (which already can be brought under Title IX's implied right of action, *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639 (1999)) under § 1983 impacts the Court's analysis.

Athletic Director, Brian Laiacona, to address her behavior.  Magalengo's parents, for their part, also reached out to Quakertown High School leadership, asking for "support in removing" transgender girls from girls' sporting events and "protecting female athletes."  Laiacona responded to Magalengo's parents, citing then-current PIAA policy (the "Former Policy," italicized below):

> Different sports organizations and governing bodies have various policies in place to address concerns with [sic] yours, aiming to create an environment where all athletes can complete [sic].  The PIAA Bylaws in Article XVI Section 4E states: *Where a student's gender is questioned or uncertain, the decision of the Principal as to the student's gender will be accepted by the PIAA.*  The decision for which team their student athlete competes under, is the decision of the Plymouth Whitemarsh SD Administration which we do not control.

In other words, because Plymouth Whitemarsh's principal—Jason Bacani—had provided that L.A. was a girl, she was allowed to compete as one, regardless of what Quakertown High School leadership thought about the issue.

The Former Policy was later amended (becoming the "Current Policy"), in the wake of President Donald J. Trump signing an Executive Order, titled *Keeping Men out of Women's Sports* (the "Executive Order").  Exec. Order 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025).  The Executive Order instructed the Secretary of Education to "take all appropriate action to affirmatively protect all-female athletic opportunities and all-female locker rooms and thereby provide the equal opportunity guaranteed by Title IX of the Education Amendments Act of 1972."  *Id.*  PIAA says it edited the Policy in an effort to comply with the Executive Order.  The Current Policy states (with changes italicized): "Where a student's *sex* is questioned or uncertain, the decision of the *school* as to the student's *sex* will be accepted by PIAA."

Despite the change, Magalengo continued to face L.A. in cross country and track meets

throughout her senior year, although the results of such races are not mentioned in the Amended Complaint, and such races were not held by Quakertown or Colonial. And because of the Former and Current Policy, transgender girls were allowed to use girls' bathrooms and locker rooms, and sometimes roomed with cisgender girls on sports-related trips, although Magalengo does not allege in her Amended Complaint that she was required to change in the same bathroom or locker room as any transgender girls—including L.A.—and does not allege that she was ever required to room with a transgender girl.

## II.    JOINDER AND JURISDICTION

Quakertown challenges Magalengo's Amended Complaint on several grounds distinct from the merits, all of which must be evaluated before the sufficiency of her allegations can be addressed.

### A.  Federal Rule of Civil Procedure 12(b)(7)

First, Quakertown moves to dismiss Magalengo's Amended Complaint under Rule 12(b)(7), arguing that Magalengo must add the Pennsylvania Human Relations Commission (the "PHRC") as a defendant for her case to proceed. Rule 12(b)(7) allows a defendant to move to dismiss an action for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). Federal Rule of Civil Procedure 19 ("Rule 19"), in turn, provides that certain parties are "Required to be Joined if Feasible." *See generally* Fed. R. Civ. P. 19(a).

A two-step analysis determines if an absent party is required under Rule 19 (and therefore, the pleading is subject to dismissal if the plaintiff fails to join said absent party). *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007). The first question is whether the party is "necessary" under Rule 19(a). *Id.* If the party is not necessary, the analysis ends; the Rule 12(b)(7) Motion must be denied. *Id.* On the other hand, if the party is necessary,

but adding the party would not be "feasible," (usually because joining the absent party would destroy subject matter jurisdiction), then a court must decide whether the party is "indispensable" under Rule 19(b).  *Id.*  If the party is necessary and indispensable, but joining the party is not feasible, then "the action cannot go forward."  *Id.* (citing *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993)).

Rules 19(a)(1)(A) and (a)(1)(B) provide when a party is necessary—a party must be joined (if feasible) if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1)(A)-(B).  Subsections (a)(1)(A) and (a)(1)(B) are listed in the disjunctive and are treated as much; if a party is necessary under either subsection, courts continue on to the feasibility and indispensability analysis.  *Gen. Refractories Co.*, 500 F.3d at 312.

In Quakertown's view, Magalengo must add the PHRC as a defendant, because—according to the Pennsylvania Human Relations Act (the "PHRA"), 43 Pa. Cons. Stat. § 951, *et seq.*—the PHRC is required to root out discrimination.  *See generally id.* § 956.  And the PHRC has interpreted "[t]he term 'sex' as used" in the context of the PHRA's prohibition on sex discrimination to include "gender identity or gender expression."  16 Pa. Code § 41.206.  So, argues Quakertown, the PHRA mandates that the PHRC ensures transgender inclusion in school sports, and a federal court's determination about whether such inclusion is lawful (which is the nub of Magalengo's claims) implicates the PHRC's interest in enforcing the state law it was created to administer.

Quakertown does not argue that the PHRC must be joined according to Rule 19(a)(1)(A), only Rule 19(a)(1)(B) is at play. But for the PHRC to be a necessary party under Rule 19(A)(1)(B), the PHRC must "'*claim[ ] an interest* relating to the subject of the action' and [be] 'so situated that disposing of the action without [it] may' either: (i) impair or impede the [PHRC's] ability to protect [its] interests; or, (ii) subject an existing party 'to a substantial risk of incurring double, multiple or otherwise inconsistent obligations' because of the [PHRC's] interest." *Incubadora Mexicana, SA de CV v. Zoetis, Inc.*, 310 F.R.D. 166, 171 (E.D. Pa. 2015) (quoting Fed. R. Civ. P. 19(a)(1)(B)) (emphasis added). Here, however, the PHRC has not claimed any such interest.

Because the PHRC has not asserted any interest in this litigation, Quakertown's Motion to Dismiss under Rule 12(b)(7) will be denied. *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*, 723 F. Supp.2d 676, 692 (D. Del. 2010) ("[W]here there is no showing that the absent party actually has claimed an interest relating to the subject of the action, the court may deny a motion to dismiss" for failure to join the absent party) (collecting cases); *Liberty Mut. Fire Ins. Co. v. Harleysville Worcester Ins. Co.*, 524 F. Supp.3d 462, 467 (E.D. Pa. 2021) ("Accordingly, where the absent party [to be joined] does not indicate that it claims an interest in the action, Rule 19(a)(1)(B) is 'rendered irrelevant.'" (quoting *Coregis Ins. Co. v. Wheeler*, 180 F.R.D. 280, 283 (E.D. Pa. 1998))).

### B. *Pullman* Abstention

Quakertown next requests that the Court abstain from exercising jurisdiction under the "*Pullman* abstention" doctrine, set forth in *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). Under *Pullman*, "federal courts should abstain from" exercising jurisdiction "'when difficult and unsettled questions of state law must be resolved before a substantial federal

constitutional question can be decided.'" *Grode v. Mut. Fire, Marine & Inland Ins. Co.*, 8 F.3d 953, 956 (3d Cir. 1993) (quoting *United Servs. Auto. Ass'n v. Muir*, 792 F.2d 356, 361 (3d Cir. 1986)).

For *Pullman* abstention to apply, there "must be three 'special circumstances:' (1) [u]ncertain issues of state law underlying the federal constitutional claims brought in federal court; (2) [s]tate law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of the adjudication of the constitutional claims; (3) [a] federal court's erroneous construction of state law would be disruptive of important state policies." *Afran v. McGreevey*, 115 F. App'x 539, 542 (3d Cir. 2004) (quoting *Chez Sez III Corp. v. Twp. of Union*, 945 F.2d 628, 631 (3d Cir. 1991)). All three circumstances must be met for a court to abstain from exercising jurisdiction. *Id.*; *Knight v. Int'l Longshoremen's Ass'n*, 457 F.3d 331, 336 (3d Cir. 2006) ("A district court has little or no discretion to abstain in a case that does not meet traditional abstention requirements." (cleaned up)). *Pullman* abstention "is generally exercised sparingly," and "ambiguity in state law will not, standing alone, require abstention." *Afran*, 115 F. App'x at 542 (citations omitted).

Quakertown's abstention argument echoes its Rule 12(b)(7) argument. In its view, if a state court upholds the PHRC's interpretation of "sex" to include "gender identity" as consistent with state law (which none has yet to do), then the PHRA would require inclusion of transgender girls in girls' sports, which (argues Quakertown) would cause Magalengo's federal statutory and constitutional claims to evaporate, or at least substantially narrow. But that has it exactly backwards. Magalengo claims that including transgender girls in girls' sports violates her federal constitutional and statutory rights. Whether such inclusion is compelled or permitted by state law is not the question; if federal law prohibits the inclusion of transgender girls in girls'

sports (as Magalengo contends), then, in these circumstances, state law would not render said inclusion lawful.  *See* U.S. Const. art VI, cl. 2 (Supremacy Clause).

Because there are no "[s]tate law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of the adjudication of the constitutional claims" that Magalengo brings, *Pullman* abstention is not permitted.  *Afran*, 115 F. App'x at 542.

### C.  *Burford* Abstention

Finally, Quakertown invokes the related doctrine, "*Burford* abstention," from the case *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  Under *Burford*:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to *interfere with the proceedings or orders of state administrative agencies*: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI)*, 491 U.S. 350, 361 (1989) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)) (emphasis added).  Accordingly, *Burford* abstention is only relevant when the plaintiff requests that a court interfere with a state's regulatory scheme: "[i]mportantly, to trigger *Burford* abstention, [the plaintiff's] action must challenge a state's regulatory scheme, rather than actions taken under color of the scheme."  *Gov't Emps. Ins. Co v. Tri Cnty. Neurology & Rehab. LLC*, 721 F. App'x 118, 122 (3d Cir. 2018) (citing *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 409-10 (3d Cir. 2005)).

Quakertown again invokes the PHRC, arguing that the PHRC's regulatory mission of

preventing discrimination will be disrupted if the Court does not abstain.  But here, Magalengo

"does not challenge the validity" of "the [PHRC's] regulations."  *Id.*  Instead, she seeks

injunctive and damages relief against the PIAA, Quakertown, and Colonial, none of whom are

state agencies.  Therefore, her "claim does not qualify as the type of challenge to a state

regulatory scheme to which *Burford* abstention applies."  *Id.*

### III.    MOTION TO DISMISS STANDARD

All three Defendants challenge under Rule 12(b)(6) Magalengo's claims for failure to

state a claim.  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Id.*  When analyzing a motion to dismiss, the complaint

must be construed "in the light most favorable to the plaintiff," with the question being "whether,

under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Fowler v.

UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted).  Legal conclusions are

disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those

facts state a "plausible claim for relief."  *Id.* at 210-11.

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits

attached to the complaint, matters of public record, as well as undisputedly authentic documents

if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223,

230 (3d Cir. 2010).  Documents "integral to or explicitly relied upon in the complaint" may also

be considered without converting a motion to dismiss into one for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted and emphasis removed).

## IV.    TITLE IX

Magalengo brings claims against each Defendant for violating Title IX, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "[T]o state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded [education program] discriminated against a person on the basis of sex." *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020).

### A.  PIAA and Federal Funds

The PIAA cites to *National Collegiate Athletic Association v. Smith*, 525 U.S. 459 (1999) for the proposition that Magalengo's Title IX claim against it must fail, because she does not allege that PIAA is federally funded (as she must, *see Doe v. Univ. of Scis.*, 961 F.3d at 209, and as she alleges for Quakertown and Colonial).

In *Smith*, the plaintiff sued the National Collegiate Athletic Association (the "NCAA" or the "Association")—the unincorporated association of 1,200 public and private universities in the United States—alleging that it violated Title IX by denying her permission to play intercollegiate volleyball on grounds it rarely used to keep men from doing so. 525 U.S. at 462-64. The NCAA argued that it could not be subject to Title IX liability, because it did not receive federal funds. *Id.* at 470. The Supreme Court agreed, explaining that the Department of Education's regulations define who qualifies as a "recipient" of federal funds as any entity "'to

whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives or benefits from such assistance.'"  *Id.* at 468 (quoting 34 C.F.R. § 106.2(h)).  That definition "ma[de] clear that Title IX coverage is not triggered when an entity merely benefits from federal funding."  *Id.*  So, an entity composed of member organizations (such as the NCAA is composed of colleges and universities) cannot be subject to Title IX simply because its members receive federal funds.  *Id.*

While Magalengo does not maintain that the PIAA receives federal funds directly, she argues that *Smith* left open the possibility of "two alternative theories" for holding an organization like the PIAA liable: (1) if said organization "directly and indirectly receives federal financial assistance through" a program it administers, and (2) if "a recipient" of federal funds such as one of the school-district Defendants here "cedes controlling authority over a federally funded program to another entity, the controlling entity," (as Magalengo sees it, the PIAA) may be "covered by Title IX regardless whether it is itself a recipient."  *Id.* at 469-70.[3]

But nowhere in her Amended Complaint are there any factual allegations regarding how member schools may have "cede[d] controlling authority over a federally funded program to" the PIAA, or how they may "indirectly receive[] federal financial assistance through" a program it administers.  *Smith*, 525 U.S. at 469-70.  As such, she has failed to adequately plead facts that support those theories of liability, and that paucity cannot be salvaged by supplementing her

---

[3] In support of that argument, Magalengo cites an out-of-circuit, and thus, non-precedential case, *B.P.J. v. West Virginia State Board of Education*, 98 F.4th 542 (4th Cir. 2024).  There, the Fourth Circuit determined that the West Virginia Secondary Schools Activities Commission (the "Commission") was subject to Title IX's proscriptions because the State of West Virginia had granted it "statutory authority to control the athletic programs of its member schools," and because it, in fact, "exercises sufficient control over direct funding recipients to make it a [possible] Title IX defendant."  *Id.* at 554.  But she does not allege that the PIAA has been granted statutory authority to control athletics in the same way that the Commission was.

allegations with putative facts set forth in her brief but not in her complaint. *Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint. . . . It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (cleaned up)).

Because she has failed to allege any facts in her Amended Complaint which would lead to the plausible inference that the PIAA is federally funded, or that federally funded entities "cede[d] controlling authority over a federally funded program to" it, *Smith*, 525 U.S. at 469-70, her Title IX claim as to the PIAA will be dismissed without prejudice. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (Federal Rules require that "leave [to amend] shall be freely given when justice so requires" (citing Fed. R. Civ. P. 15(a))).

### B. Colonial and Statutory Standing

Colonial argues that Magalengo does not have statutory standing to sue it under Title IX. "Statutory standing . . . asks whether Congress has accorded *this* injured plaintiff the right to sue the defendant . . . .'" *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 n.3 (3d Cir. 2015) (quoting *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007)). The Third Circuit, in *Oldham v. Pennsylvania State University*, 138 F.4th 731 (3d Cir. 2025), recently outlined the test for whether a plaintiff—who is not an employee or student at a school (like Magalengo is to Colonial)—has statutory standing under Title IX to sue that school.

In that case, Jennifer Oldham, a self-employed female fencing coach, and George Abashidze, a male fencing coach employed by Pennsylvania State University ("Penn State"), attended a fencing competition. *Id.* at 738-39. After the tournament, Oldham boarded a flight home and sat next to Abashidze, who sexually harassed and assaulted her throughout the flight.

*Id.* A few weeks after the flight landed, Oldham called her mentor—Wieslaw Glon, the head fencing coach at Penn State—and relayed what Abashidze had done. *Id.* at 739. Glon encouraged Oldham to keep the incident to herself, but eventually, the story came out, and Glon and Abashidze made efforts to discredit Oldham's story and tank her career. *Id.* at 739-40.

Oldham sued Penn State, bringing a sexual harassment and retaliation claim under Title IX; Penn State argued that Oldham did not have statutory standing to sue it under Title IX, because she was neither a student at Penn State nor an employee there. *Id.* at 742. The Third Circuit held that a plaintiff has statutory standing to sue under Title IX if two conditions are met: (1) "the funding recipient"—there Penn State—"'exercise[d] substantial control' over the *individual* who mistreat[ed] the plaintiff based on sex'" and, (2) "the Title IX funding recipient [had] substantial control over 'the *context*' in which the mistreatment occurred or manifest.'" *Id.* at 746 (emphasis added). Penn State had "substantial control" over Abashidze and Glon, in part because "each [were] employed by Penn State." *Id.*

However, Penn State did not have substantial control "over 'the context' in which" each instance of "mistreatment occurred or manifested." *Id.* at 746-47. As to the harassment claims, "the amended complaint lack[ed] allegations about Penn State's substantial control over the flight," *i.e.*, where the purported harassment occurred. *Id.* at 747. "[E]ven though" Oldham's "allegations support[ed] Penn State's substantial control over Abashidze . . . [but] Oldham [had] not provided a basis for inferring that Penn State had substantial control over" the flight. *Id.* at 747. Conversely, the amended complaint "allege[d] that because of" Glon's and Abashidze's retaliation campaign to ruin Oldham's career, "she was excluded from events hosted by Penn State." *Id.* at 748. Penn State had control over that setting, so therefore, Oldham had statutory standing to bring a Title IX claim for those allegations, but not "[t]he other settings in which the

retaliation campaign manifested itself," which "were not within Penn State's substantial control." *Id.*

Magalengo argues that here, just like in *Oldham*, Colonial's employees—*i.e.*, Plymouth Whitemarsh's coaches and staff—were the individuals responsible for her Title IX claim, because they let L.A. run against cisgender girls, and thus, because Colonial, as their employer, exercised substantial control over them, she has statutory standing to sue Colonial under Title IX. But that is not the end of the inquiry.  To succeed on her argument, Magalengo must also sufficiently allege that Colonial had substantial control over the context in which the alleged discrimination occurred.  But she has failed to plead any facts establishing that Colonial had any "control over the context in which the discrimination *either* occurred *or* manifested."  *Id.* at 748. Indeed, although Magalengo alleges that she raced against L.A. in a handful of races, she alleges that only one race was held in a context controlled by any Defendant here, and it was held at Quakertown High School—which is located within Quakertown, not Colonial.

Because Magalengo has failed to adequately plead that Colonial exercised "substantial control over [the] setting" in which the purported Title IX violations occurred, she has failed to establish statutory standing to bring a Title IX claim against Colonial.  As such, her claim will be dismissed without prejudice.  *In re Burlington Coat Factory*, 114 F.3d at 1434.

### C.  Quakertown

Quakertown challenges Magalengo's Title IX claim solely on the merits.  A Title IX claim boils down to three elements: (1) the plaintiff "was subjected to discrimination in an educational program, (2) . . . the program receives federal assistance, and (3) . . . the discrimination was on the basis of sex."  *A.H. v. Minersville Area Sch. Dist.*, 290 F. Supp.3d 321, 326 (M.D. Pa. 2017) (quoting *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp.3d 267, 295

(W.D. Pa. 2017)). But "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct." *Davis*, 526 U.S. at 640. "The recipient itself must exclude persons from participation in, deny persons the benefits of, or subject persons to discrimination under its programs or activities in order to be liable under Title IX." *Id.* at 640-41 (cleaned up). To be liable, "funding recipients [must] have notice of their potential liability." *Id.* at 641. To the extent that a Title IX claim is predicated on a third-party's actions, plaintiffs must plead facts supporting the conclusion that the defendant acted with deliberate indifference. *Id.* at 641-43 (recognizing that a school may be held liable for student-on-student harassment when the school is aware of such harassment and chooses to ignore it).

### i.    *Bathrooms and Locker Rooms*

Magalengo appears to plead two different purported violations of Title IX. The first is that transgender girls used cisgender girls' bathrooms and locker rooms, and some transgender girls roomed with cisgender girls. But in her briefing, Magalengo makes no effort to link such facts to her Title IX claim, despite Quakertown moving to dismiss her Amended Complaint in its entirety—so any purported Title IX claim against Quakertown based on those theories will be dismissed. *Arcuri v. Cnty. of Montgomery*, 2021 WL 1811576, at *10 (E.D. Pa. May 6, 2021) (failure to defend claims in response to motion to dismiss constitutes abandonment of such claims) (collecting cases). And because a Title IX claim predicated on allowing transgender students to use bathrooms and locker rooms according to their gender identity is unlikely to succeed on the merits, such a dismissal will be with prejudice. *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533-34 (3d Cir. 2018) (holding that—in affirming a denial of a preliminary injunction—a policy of allowing transgender students to use their preferred bathroom and locker rooms does not violate Title IX).

### ii.  Equal Opportunity in Athletics

The second purported violation (and the only one Magalengo defends in her briefing) is that Quakertown deprived her of equal opportunities to compete in athletics by allowing L.A. to compete against her.  But, Magalengo does not allege that Quakertown had any knowledge that L.A. was set to compete in the one race it hosted until Magalengo's parents complained to Quakertown leadership—*after* Magalengo had already lost the race.  Without adequate "notice of [its] potential liability," *Davis*, 526 U.S. at 641, Quakertown cannot be held liable under Title IX.

Thus, Magalengo's Title IX claim against Quakertown for deprivation of her equal opportunities to compete will be dismissed without prejudice.  *In re Burlington Coat Factory*, 114 F.3d at 1434.

### D.  Punitive Damages

In her Amended Complaint, Magalengo seeks punitive damages from each Defendant for their purported Title IX violations, but punitive damages are not available under Title IX. *Brooks v. State Coll. Area Sch. Dist.*, 707 F. Supp.3d 448, 463-64 (E.D. Pa. 2023) (citing *Barnes v. Gorman*, 536 U.S. 181, 186-87 (2002) (interpreting Title VI, which is interpreted similarly to Title IX, to not allow for a punitive damages remedy).  As such, any request for punitive damages premised on her Title IX claims will be dismissed with prejudice.

### V.  SECTION 1983 CLAIMS

Magalengo brings § 1983 claims against each Defendant for depriving her of her right to equal protection under the law and right to bodily privacy, in violation of the Fourteenth Amendment to the United States Constitution.  To state a claim under § 1983, Magalengo must plausibly "allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color

of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Defendants do not contest that they were

operating under color of state law.

### A.  Policy or Custom

To state a claim under § 1983 against a municipality, such as a school district (like

Quakertown and Colonial), a plaintiff must plausibly plead that her injuries were caused by

either: (1) actions taken by a municipality pursuant to official policies or customs of the

municipal entity; or, (2) "a failure or inadequacy by the municipality that 'reflects a deliberate or

conscious choice.'"  *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citing *Est. of Roman v.

City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)); *see also Stoneking v. Bradford Area Sch.

Dist.*, 882 F.2d 720, 724-25 (3d Cir. 1989) (applying the two theories to school districts).  The

two theories—the policy-or-custom theory and the failure-or-inadequacy theory—have different

requirements.  *Forrest*, 930 F.3d at 105.  Although Magalengo cites once to the failure-or-

inadequacy theory in her briefing, she does not squarely argue that such theory applies—so only

the policy-or-custom theory will be addressed.  *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*,

119 F.3d 1070, 1076 n.6 ("[A]rguments raised in passing . . . but not squarely argued, are

considered waived." (citing *Pa. Dep't of Pub. Welfare v. U.S. Dep't of Health & Human Servs.*,

101 F.3d 939, 945 (3d Cir. 1996))).

As for policy-or-custom, "[p]olicy is made when a decisionmaker possess[ing] final

authority to establish municipal policy with respect to the action issues an official proclamation,

policy, or edict."  *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (internal

quotations omitted).  A custom, on the other hand, can be shown whenever the "practices of state

officials . . . [are] so permanent and well settled as to virtually constitute law."  *Id.* (internal

quotation omitted).

###### i.    *Quakertown*

In her Amended Complaint, Magalengo alleges that "Quakertown adopted the PIAA policy." But such allegation is the paradigmatic "[t]hreadbare recital[] of the elements of [her] cause of action," that a court must disregard in evaluating a motion to dismiss. *Iqbal*, 556 U.S. at 678. She does allege in her Amended Complaint that Quakertown High School "applied" PIAA policy "without change," and as for her *briefing*, Magalengo maintains that "by allowing L.A. to compete at the hosted events, [Quakertown] upheld a policy that allowed biological male athletes to be classified as something other than their biological sex," and that she was deprived of her constitutional rights "as a direct result of the well-settled decisions and practices enforced by [Quakertown] and its faculty to allow a biological male athlete to race against her and use the locker rooms and bathrooms."

But those assertions are squarely contradicted by the other factual allegations in her Amended Complaint. She specifically alleges that Laiacona—Quakertown High School's Athletic Director—stated that "the decision of" whether L.A. would compete against cisgender girls was "the decision of" Plymouth Whitemarsh, "which [Quakertown High School did] not control." And she does not dispute Laiacona's representation that Quakertown was powerless to stop that decision once it had been made. Nor does she identify any instance of Quakertown applying PIAA to allow a transgender student to compete according to their gender identity.

Courts "are not . . . required to accept as true unsupported conclusions and unwarranted inferences," especially when such "assertions are belied by . . . the remaining factual allegations." *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997). Because the Amended Complaint is devoid of any facts which would allow a reader to plausibly infer that Quakertown had a policy or custom implicating Magalengo's claims, her

§ 1983 claim against Quakertown must be dismissed.

### ii.    *Colonial*

Similarly, Magalengo's Amended Complaint alleges that "Colonial adopted the PIAA

policy," but again, such "[t]hreadbare recital[] of the elements of [her] cause of action need not

be considered. *Iqbal*, 556 U.S. at 678.  The only factual allegation in her Amended Complaint

which could be relevant to Colonial is that Quakertown High School's Athletic Director,

Laiacona, stated that Bacani—Plymouth Whitemarsh's principal—determined that L.A. could

compete on the girls' team.  But Magalengo again fails to allege that that Bacani's choice

constituted anything close to "an official proclamation, policy, or edict" of including L.A.—or

transgender girls in general—in girls' sports.  *Berg*, 219 F.3d at 275.  Nor does she allege any

facts that would plausibly lead to the conclusion that Plymouth Whitemarsh's "practice[] of"

including L.A.—or, more generally, transgender girls—in girls' sports was "so permanent and

well settled as to virtually constitute law."  *Id.* (internal quotation omitted).  Indeed, she does not

identify any other transgender girls who competed on Plymouth Whitemarsh's team—or the

teams of any other schools within Colonial.

*          *          *

Magalengo's original Complaint purported to bring § 1983 claims against both

Quakertown and Colonial, and both moved to dismiss those claims—for largely the reasons set

forth above—before she amended her Complaint.  Because Magalengo has failed to state her

§ 1983 claims against Quakertown and Colonial by failing to allege that they maintained a policy

or custom, such claims will be dismissed with prejudice.  *Krantz v. Prudential Invs. Fund Mgmt.*

*LLC*, 305 F.3d 140, 144 (3d Cir. 2002) ("A District Court has discretion to deny a plaintiff leave

to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose

not to resolve them.").

### B. The PIAA

All that remains is Magalengo's constitutional claims against the PIAA, which PIAA argues should be dismissed on the merits. Magalengo alleges that PIAA's policy of including transgender girls in girls' sports deprived her of her rights to bodily privacy and rights to equal protection under the law, both such rights secured by the Fourteenth Amendment. Each claim will be addressed *seriatim*.

### i.    *Bodily Privacy*

Magalengo alleges that because PIAA's Former and Current Policies allowed transgender girls to compete on girls' teams, it allowed them to access women's bathrooms and locker rooms.[4] Such access, Magalengo argues, deprives her of a privacy interested protected by the Fourteenth Amendment to the United States Constitution. To the extent that Magalengo predicates her claims on the allegation that transgender girls were allowed to change in girls' bathrooms or locker rooms, meaning some cisgender girls may have exposed themselves in front of transgender girls, she fails to allege that *she* ever shared a bathroom or locker room with a transgender girl. That alone may be enough to dismiss her claim. *The Pitt News v. Fisher*, 215 F.3d 354, 362 (3d Cir. 2000) ("[T]he federal courts adhere to a prudential rule that '[o]rdinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party.'" (quoting *Singleton v. Wulff*, 428 U.S. 106, 114 (1976)).

But even if she did allege that she had changed clothing in the same room as any transgender girls, *Doe v. Boyertown*—the Third Circuit case evaluating an identical claim under

---

[4] Magalengo also alleged that transgender girls roomed with cisgender girls on certain sports related trips but makes no mention of said allegation in her briefing, so such allegation will not be considered.

similar facts—determined that no constitutional violation occurred.  There, the defendant-school districts maintained a policy that allowed transgender students to use bathrooms and locker rooms consistent with their gender identities, as opposed to the sex they were assigned at birth. *Doe v. Boyertown*, 897 F.3d at 521.  The plaintiffs brought a constitutional privacy claim and sought a preliminary injunction preventing transgender students from using their preferred bathrooms and locker rooms.  *Id.*  The district court declined to award plaintiffs that relief, because it determined that they were unlikely to succeed on the merits.  *Id.*

The Third Circuit affirmed.  *Id.*  As it explained, "a person has a constitutionally protected privacy interest in his or her partially clothed body."  *Id.* at 527 (citing *Doe v. Luzerne Cnty.*, 660 F.3d 169, 177 (3d Cir. 2011)).  But "[t]he constitutional right to privacy is not absolute."  *Id.* at 528 (citing *Doe v. Se. Pa. Transp. Auth. (SEPTA)*, 72 F.3d 1133, 1138 (3d Cir. 1995)).  "Only unjustified invasions of privacy" are actionable.  *Id.* (citing *SEPTA*, 72 F.3d at 1138).  And the government can justify its invasion of privacy if it shows that the invasion is "sufficiently tailored to serve a compelling state interest."  *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 301-02 (1993)).

The *Boyertown* Court elaborated that "[t]he Supreme Court has regularly held that the state has a compelling interest in protecting the physical and psychological well-being of minors," and that the Third Circuit itself has "similarly found that the government has a compelling interest in protecting and caring for children in various contexts."  *Id.* at 528-29 (collecting cases).  Therefore, because "transgender students face extraordinary social, psychological, and medical risks . . . , the School District clearly had a compelling state interest in shielding them from discrimination."  *Boyertown*, 897 F.3d at 528.  And because "[m]istreatment of transgender students can exacerbate gender dysphoria, lead to negative

educational outcomes, . . . precipitate self-injurious behavior," and "[w]hen transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening," the Court held that "the School District had a compelling state interest" in allowing transgender students to use their preferred bathrooms and locker rooms. *Id.* at 529.

As for whether the policy was sufficiently tailored to advance that compelling interest, the Court concluded that it was. *Id.* at 530. In doing so, it rejected the plaintiffs' argument that providing single-user accommodations would be a more tailored method of meeting the defendant-school district's needs. *Id.* It emphasized that alternatives other than allowing transgender students to use their preferred bathroom would not just fail to "serve the compelling interest that the School District ha[d] identified . . . [,] it would significantly undermine" that compelling interest. *Id.*

So too here. Magalengo does not dispute that, here, just as in *Doe v. Boyertown*, "the School District clearly had a compelling state interest in shielding [transgender students] from discrimination." 897 F.3d at 528. Nevertheless, she argues that letting L.A. (or other transgender students) use their preferred bathroom is not narrowly tailored to meet the Defendants' compelling interests, because, as she asserts for the first time in her briefing, she was required to change with transgender students. An allegation of such a requirement is glaringly absent from her Amended Complaint; she only alleges that transgender girls were *allowed* to change clothes in girls' locker rooms, not that she was *required* to change near them, so such argument need not be considered. *Zimmerman*, 836 F.2d at 181.

And even if she had alleged that she was required to change near transgender girls, the *Boyertown* Court explicitly rejected the argument that such an allegation would somehow alter the analysis, and "decline[d] to recognize" the more "expansive constitutional right to privacy"

that Magalengo wishes to invent—"a right that would be violated by the presence of students who do not share the same birth sex." *Id.* at 531.  The *Boyertown* Court refused to do so, because the plaintiffs—like Magalengo—were "claiming a very broad right of personal privacy in a space that is, by definition and common usage, just not that private." *Id.*

Because Magalengo has presented only the one argument for why *Boyertown* is distinguishable, and because said argument is squarely foreclosed by *Boyertown* itself, leave to amend would be futile, so her bodily privacy claims will be dismissed with prejudice.  *See Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) (amendment futile if additional facts would not state a claim).

## ii.   Equal-Protection Claims

Magalengo also claims that the PIAA violated her rights secured by the Equal Protection Clause, which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Magalengo argues that she was subject to sex-based discrimination by virtue of having to compete against L.A.[5]

To state a sex-based discrimination claim, Magalengo must plausibly allege such discrimination was "purposeful" and that she "received different treatment from that received by other individuals similarly situated."  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (cleaned up).  To maintain such a claim, Magalengo must allege that she was: "(1) a

---

[5] In her briefing, Magalengo cites *Craig v. Boren*, 429 U.S. 190, 197 (1976).  That case holds that when a plaintiff brings a facial challenge to a government statute or policy that classifies based on gender or sex, the classification must pass intermediate scrutiny—meaning it "must serve important governmental objectives and must be substantially related to achievement of those objectives"—or otherwise be struck down. *Id.* at 197-98.  She does not, however, use that jurisprudential proposition as a springboard for any argument that she is challenging PIAA Policies for facially classifying based on gender or sex: her briefing focuses on the "different treatment" that she believes she received, how the Policy operated "as applied" to her, and the "impact" on cisgender girls that she believes the Policy will have.  Waving languidly in the direction of an argument is not making one. *John Wyeth*, 119 F.3d at 1076 ("[A]rguments raised in passing . . . but not squarely argued, are considered waived." (citations omitted)).

member of a protected class" (here, that she is female); "(2) similarly situated to members of an unprotected class" *i.e.*, male students; "and (3) treated differently from members of the unprotected class." *Green v. Chester Upland Sch. Dist.*, 89 F. Supp.3d 682, 693 (E.D. Pa. 2015) (citing *Oliveira v. Twp. of Irvington*, 41 F. App'x 555, 559 (3d Cir. 2002); *Keenan v. City of Philadelphia*, 983 F.2d 459, 465 (3d Cir. 1992)).  In essence, Magalengo must allege that she was treated differently because she is female rather than male.  *Id*.

Magalengo has failed to do so.  Her Amended Complaint is devoid of any factual allegations that she was subject to purposeful discrimination, other than asserting as much in the most conclusory fashion.  Nor does she allege that she was treated differently than any students who are male.  Indeed, the thrust of her Amended Complaint is that she was treated the *same* as a student assigned male at birth—L.A.—in that they were both allowed to compete in girls' sports. She points to no instances of students assigned female at birth being treated differently than those assigned male at birth, and, as such, she has failed to plausibly state a claim for sex-based discrimination.  *Startzell v. Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (Equal Protection Claim requires identification of similarly situated "comparable parties," who were treated differently).

Magalengo attempts to salvage her equal protection claim by arguing that the inclusion of transgender girls in girls' sports will "likely only impact girls, because" of "the inherent biological advantages" that students assigned male at birth might retain over students assigned female at birth.  But "[t]he Equal Protection Clause, [the Supreme Court] has held, prohibits only intentional discrimination; it does not have a disparate-impact component."  *Ricci v. DeStefano*, 557 U.S. 557, 627 (2009) (Ginsburg, J., dissenting) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Washington v. Davis*, 426 U.S. 229, 239 (1976)); *see also Skrmetti*, 145 S.

Ct. at 1858 (Alito, J., concurring in part and concurring in the judgment); *Kennedy v. City of Philadelphia*, 588 F. Supp.3d 598, 611 (E.D. Pa. 2022) (citing *Dunleavy v. New Jersey*, 2008 WL 199467, at *5 n.2 (D.N.J. Jan. 18, 2008)).

Magalengo's original Complaint purported to bring equal-protection claims, and Defendants moved to dismiss those claims—for largely the reasons set forth above—before she amended her Complaint. Because Magalengo has failed to state her equal protection claims in her Amended Complaint, such claims will be dismissed with prejudice. *Krantz*, 305 F.3d at 144 ("A District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them.").

An appropriate order follows.

**BY THE COURT:**

_____

**WENDY BEETLESTONE, J.**